UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

AULISTAR MARK, et al., etc.,                         :
                                                     :      Case No.:  13-CV-04347 (AJN)
                        Plaintiffs,                  :
                                                     :
            v.                                       :      **ECF Case**
                                                     :
GAWKER MEDIA LLC and NICK DENTON,                    :
                                                     :
                        Defendants.                  :
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
## CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE

Mark W. Batten
Alison M. Langlais
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Phone: (6170 526-9850
Fax: (617) 526-9899
mbatten@proskauer.com
*Attorneys for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

    A.    The Vastly Different Internship Opportunities At Gawker ................................. 2

    B.    All Internship Opportunities Were Intended To Be Learning Experiences For The Benefit Of The Interns. ......................................................................................... 3

ARGUMENT ...................................................................................................................... 5

    A.    The Individualized Balancing Test That Governs The Legality of Unpaid Internships Precludes Certification. .................................................................... 5

        1.    The Widely-Adopted "Primary Beneficiary" Test Applies Here And Precludes Certification As A Matter Of Law. ........................................... 6

        2.    Plaintiffs' Proposed Test Ignores The Law. ............................................ 10

    B.    Plaintiffs Have Failed To Show That They Are Similarly Situated To The Proposed Collective. .......................................................................................... 12

        1.    The Internship Postings Are Either Irrelevant Or Support Gawker's Position. ..................................................................................................... 13

        2.    Plaintiffs' Conclusory Declarations Add Nothing. .................................. 15

        3.    The Emails Plaintiffs Submit Do Not Suggest A Similarly Situated Collective. .................................................................................................. 17

    C.    The Record As A Whole Demonstrates That Plaintiffs' Claims Turn On An Individualized Analysis, The Antithesis Of A Collective Claim. ....................... 18

    D.    Should The Court Grant Certification It Should Not Accept Plaintiffs' Proposed Notice. ............................................................................................................... 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372 (W.D. Pa. 2011) ............................................... 3

*Anglada v. Linens 'n Things*, 2007 WL 1552511 (S.D.N.Y. Apr. 26, 2007) ............................... 11

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008)...................................... 4

*Barron v. Henry County School System*, 242 F. Supp. 2d 1096 (M.D. Ala. 2003) ..................... 24

*Baum v. Shoney's Inc.*, 1998 WL 968390 (M.D. Fla. Dec. 3, 1998)............................................. 11

*Blair v. Wills*, 420 F.3d 823 (8th Cir. 2005) ................................................................................. 4

*Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344 (W.D.N.Y. 2011) .................................................. 10

*Colozzi v. St. Joseph's Hospital Health Center*, 595 F. Supp. 2d 200 (2009) ............................ 11

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ..................................................................... 18

*Daud v. Ichiban Japanese Restaurant*, 2010 U.S. Dist. LEXIS 101281 (D.N.J. Sept. 23, 2010) 23

*Donovan v. American Airlines, Inc.*, 686 F.2d 267 (5th Cir. 1982)................................................ 5

*Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181 (S.D.N.Y. 2010)............... 9

*Eng-Hatcher v. Sprint Nextel Corp.,* 2009 WL 7311383 (S.D.N.Y. 2009)................................. 10

*Fernandez v. Wells Fargo Bank,* 12-cv-7193, 2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) .... 13

*Glatt v. Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784, 2013 WL 2495140 (S.D.N.Y. June 11, 2013) ........................................................................................................................................... 8

*Grayson v. K Mart Corp.*, 79 F.3d 1086 (11th Cir. 1996) ........................................................... 24

*Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797 (S.D.N.Y. 2012).................................... 11

*Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249 (S.D.N.Y. 1997) ....................................................... 16

*Holzapfel v. Town of Newburgh*, 145 F.3d 516 (2d Cir. 1998) ..................................................... 6

*Ikikhueme v. CulinArt, Inc.*, No. 13 Civ. 293 (JMF), 2013 WL 2395020 (S.D.N.Y. June 3, 2013) ................................................................................................................................................. 13

*Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317 (E.D.N.Y. 2012)...................................... 10

*Kahn v. Airport Management Servs. LLC*, No. 10 Civ. 7735 (NRB), 2011 WL 5597371 (S.D.N.Y. 2011) ............................................................................................... 14

*Kaplan v. Code Blue Billing & Coding, Inc.*, 504 Fed. Appx. 831 (11th Cir. 2013).................... 5

*Keef v. M.A. Morenson Co.*, 2008 U.S. Dist. LEXIS 59076 (D. Minn. Aug. 4, 2008)................ 23

*Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008) ......................... 11

*McLaughlin v. Ensley*, 877 F.2d 1207 (4th Cir. 1989) ........................................................... 5

*Morales v. Plantworks, Inc.*, 2006 WL 278154 (S.D.N.Y. Feb. 2, 2006) .................................. 11

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008).................................... 2

*Myers v. Hertz Corp.*, 624 F.3d 537 (2010).......................................................................... 6

*Myers v. Hertz Corp.*, No. 02-CV-4325 (DRH) (MLO) (E.D.N.Y. May 18, 2006).................... 6

*Reich v. Parker Fire Protection Dist.*, 992 F. 2d 1023 (10th Cir. 1993) .................................... 5

*Roman v. Maietta Constr.*, 147 F.3d 71 (1st Cir. 1998) ......................................................... 6

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947) ....................................................... 4

*Silva v. Calle 8, LLC*, 2013 WL 6330848 (E.D.N.Y. Dec. 5, 2013)........................................ 13

*Solis v. Laurelbrook Sanitarium & School, Inc.*, 642 F.3d 518 (6th Cir. 2011) ............................ 4

*Todaro v. Township of Union*, 27 F. Supp. 2d 517 (D.N.J. 1999).............................................. 5

*Velez v. Sanchez*, 693 F.3d 308 (2d Cir. 2012)...................................................................... 4

*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947)........................................................... 3

*Wang v. Hearst Corp.*, No. 12 Civ. 793, 2013 WL 1903787 (S.D.N.Y. May 8, 2013)...... 5, 19, 23

*Williams v. Long*, 585 F. Supp. 2d 679 (D. Md. 2008).......................................................... 23

**Other Authorities**

DOL Opinion Letter, 1970 WL 26388 (March 31, 1970) ......................................................... 16

DOL Opinion Letter, 1995 WL 1032496 (July 11, 1995) ......................................................... 16

DOL Opinion Letter, 1996 WL 1031777 (May 8, 1996) .......................................................... 16

## INTRODUCTION

The Supreme Court held more than 65 years ago, and every federal circuit to consider the issue has since affirmed, that not every individual who works with a for-profit business is an "employee" under the law.  Individuals are free to volunteer their time and services when they do so for their own "personal purpose or pleasure" rather than in expectation of wages.  Under long-established and well-accepted law, the boundary between such voluntary relationships and employment is not distinctly marked: it requires a court to balance the tangible and intangible benefits a particular individual receives from the experience against the benefits received from or burdens shouldered by the supposed employer.

If that analysis ever can be conducted on an aggregate or representative basis, it cannot be here.  The four plaintiffs cannot possibly represent the collective they describe; they essentially concede in their declarations that they know nothing about the experience of any other Gawker intern, and for that matter the record presents sharp factual disputes about the relative benefits of even their four individual internships.  These plaintiffs could testify at trial about their own experiences, in which they claim they learned little and contributed much.  Their supervisors will contradict both parts of that account. A jury could resolve those disagreements, but those four verdicts would say nothing about the legality of any other internship.  There are many interns who loved their time at Gawker; who believe that they learned things about themselves, their career aspirations, and the online media business that they never could learn in a classroom; and whose internships enabled them to start on a rewarding career.  Even taking the Plaintiffs' disgruntled accounts as accurate, they cannot speak for all interns, nor claim that their individual stories are representative of a typical intern's experience.

In moving for conditional certification under the Fair Labor Standards Act ("FLSA"), Plaintiffs rely heavily on the "modest" burden courts often apply to such motions.  But even

under that standard, Plaintiffs still must give the Court a factual basis to conclude that they are similarly situated to the collective they hope to represent, and some assurance that the case can be litigated fairly on a representative basis.  On the facts presented and the governing law, they cannot satisfy either of those elements, regardless of how strict or lenient the standard. Plaintiffs' motion must be denied.

**STATEMENT OF FACTS**

**A.     The Vastly Different Internship Opportunities At Gawker**

Gawker Media, LLC is an online media company and blog network, and the parent company for eight different weblogs: Gawker.com, Deadspin, Lifehacker, Gizmodo, io9, Kotaku, Jalopnik, and Jezebel.  Each blog has developed its own voice and focus.  For instance, Kotaku concentrates on video games, Deadspin concentrates on sports, and io9 concentrates on science, futurism and science fiction.

Gawker has never conducted an internship program and has never recruited interns in any formalized or systematic way.  Kidder Decl. ¶4.  Each site and each non-editorial department at Gawker had autonomy to decide whether it wanted interns, how many it wanted to have, how to recruit interns, how extensively the interns were trained, and when and for how long the interns would be there.  *Id.*  Most sites and departments typically had up to four interns at a time, but sometimes had none, and there were no minimums or limitations imposed on any department or site.  *Id.*  The sites often based their decision to recruit interns on whether they had sufficient time to properly train and oversee them.  Totilo Decl. ¶5.  Some interns sought the internships themselves by contacting editors or department heads.  J. Ma Decl. ¶4.  The sites varied in whether interns contributed remotely, in the office, or both.  *See, e.g.,* Totilo Decl. ¶3; Newitz Decl. ¶¶6-7; Gordon Decl. ¶6.  Since 2007, there have been interns at some of the individual

blogs, with Gawker's community moderation group, and in corporate departments such as legal and technology.  Kidder Decl. ¶4.

Each site or department at Gawker chose whether to pay its interns, how much to pay them, and how to structure the payments out of their own budgets.  *Id.* ¶5.  Some interns were unpaid, some were paid small amounts at irregular intervals from their supervisors, and some were paid stipends on a monthly basis.  *Id.*  There was never any promise of employment at Gawker or any of the blogs at the end of any internship, though oftentimes the internship experience resulted in full-time employment.[1]

Interns worked as little as a few hours a week, and as much as forty hours a week, all depending on their individual schedules and desires and as discussed with their individual supervisors.  Kidder Decl. ¶4.  Intern schedules were quite flexible and varied from site to site, but were often driven by the interns' choice to contribute to particular projects.[2]

### B. All Internship Opportunities Were Intended To Be Learning Experiences For The Benefit Of The Interns.

Though training opportunities and training styles varied from site to site, all interns received one-on-one mentoring and significant supervision.  At Kotaku, for instance, Deputy Editor Stephen Totilo trained interns informally by treating them as apprentices, encouraging them to sit physically next to him to watch and shadow him throughout the day.  Totilo Decl. ¶10.  He taught them how to use various programs and tools in a hands-on manner.  *Id.*  At io9, Editor-In-Chief Annalee Newitz provided interns with a formal training program that included instruction on how to craft a posting, how to write in io9's voice, and the nuts and bolts of being

---

[1] *Id.* at ¶¶ 6-7.  *See also* Totilo Dec. at ¶ 12; Newitz Decl. at ¶ 12; Gordon Decl. at ¶ 14; Blakeley Decl. at ¶ 7.

[2] *See, e.g.,* Totilo Decl. at ¶ 9; Annis Decl. at ¶ 7; J. Ma Decl. at ¶¶ 5, 11; Newitz Dec. at ¶ 6; Gordon Decl. at ¶¶ 3, 8.

a reporter in the industry.  Newitz Decl. ¶8.  Her hope was that by the end of the internship, every intern would have learned enough to produce an article that was publication-ready.  *Id.*  To that end, she provided interactive feedback on their writing so they could learn how to improve it from an industry expert.  *Id.* ¶9.  Whitson Gordon interned with Lifehacker in 2009 and was later hired by Lifehacker as a writer and promoted to Editor-In-Chief.  Gordon Decl. ¶2.  His experience as both an intern and an intern supervisor was that "most of the internship consisted of training."  Gordon Decl. ¶10.  At Gawker.TV,  Editor-In-Chief Richard Blakeley created a detailed training program to teach interns invaluable skills in the publishing industry, held daily or weekly meetings with them, and taught them the building blocks and basic principles of how a publication works.  Blakeley Decl. ¶4.  Former intern Rose Annis participated in this formal training program at GTV, where she learned how to use video editing software, how to spot clips, and how to pitch stories.  Annis Decl. ¶10.  At Gizmodo, former intern Quinton Ma received constant training from editors on a more informal basis.  Q. Ma Decl. ¶6.  Former intern Jesse Ma spent his spring semester during law school as an intern in Gawker's legal department, where he was given the opportunity to shadow and observe Gawker's former COO in her daily activities.  J. Ma Decl. ¶6.

Universally, intern supervisors and interns reported that interns received significantly more detailed and ongoing training than employees.[3]  Employees were expected to have general industry knowledge and a higher level of researching, writing, and editing skills, and already be trained in the basics of how to use particular programs.[4]  All content written by interns was reviewed and edited by their supervisors, who provided them with feedback and direction, before

---

[3] Totilo Decl. ¶10; Q. Ma Decl. ¶6; Gordon Decl. ¶10; Blakeley Decl. ¶4; Newitz Decl. ¶¶8-9.

[4] Totilo Decl. ¶10; Q. Ma Decl. ¶6; Gordon Decl. ¶10; Blakeley Decl. ¶4; Craggs Decl. ¶5.

they were allowed to post their contributions.[5]  Employees were permitted and expected to post their work on their own.[6]  The goal was always that interns would get introduced to the world of online publications, by teaching them how to publish, find stories, craft headlines, write articles, and deal with public reaction.  Totilo Decl. ¶11.  Paid employees were expected to already know how to do these things.[7]  Ultimately, intern supervisors spent a lot of their time teaching and guiding interns, and their own productivity was impeded because of it.[8]

## ARGUMENT

### A.    The Individualized Balancing Test That Governs The Legality of Unpaid Internships Precludes Certification.

A class or collective action fundamentally is a *representative* action: one in which the claims and interests of the entire group are so closely aligned, and so thoroughly governed by the same facts and legal analysis, that deciding the claims of the class representatives is sufficient to decide the claims of the entire class, without the need to examine the particular circumstances of individual class members.  *See, e.g., Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1264-65 (11th Cir. 2008).  All of the standards that govern the certification of collective actions under the Fair Labor Standards Act and class actions under Fed. R. Civ. P. 23 address aspects of that single question: is it fair to the absent class members, and to the defendant, to have hundreds or thousands of individual claims decided in a single proceeding, where the vast majority of those individuals will never set foot in the courthouse, and the facts of their individual cases will never be examined?

---

[5] Totilo Decl. ¶11; Annis Decl. ¶12; Gordon Decl. ¶10; Blakeley Decl. ¶4; Newitz Decl. ¶¶8-9.

[6] Totilo Decl. ¶11; Newitz Decl. ¶9; Gordon Decl. ¶10; Blakeley Decl. ¶4.

[7] Totilo Decl. ¶10; Q. Ma Decl. ¶6; Gordon Decl. ¶10; Blakeley Decl. ¶4.

[8] Totilo Decl. ¶15; J. Ma Decl. ¶13; Newitz Decl. ¶13.

Sometimes, that aggregation is appropriate, because the claims of the class so depend on the same facts and law that multiple trials would be redundant. For example, in *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 379 (W.D. Pa. 2011), plaintiffs challenged "a longstanding agreement" between an employer and a union "that any time spent outside an employee's eight-hour shift walking to and from the locker rooms after donning and prior to doffing protective gear is not compensated." This rule unquestionably applied to every union employee, under the express terms of the collective bargaining agreement. There was no reason, then, to treat each employee's case individually; a single legal determination as to whether the policy complied with the FLSA could be applied to every member of the class.

This case could not be more different. Unpaid internships are neither per se lawful nor per se unlawful; under established law, that question depends on an individualized balancing of the benefits a particular intern gains from the experience against the benefits that the putative employer received from the interns' work – an analysis that cannot be conducted on an aggregate basis. Plaintiffs try to avoid this fundamental defect by arguing for a different legal standard, but they can do so only by wholly ignoring the long line of cases that establishes this fact-specific, intern-specific test.

1. **The Widely-Adopted "Primary Beneficiary" Test Applies Here And Precludes Certification As A Matter Of Law.**

More than 65 years ago, the Supreme Court rejected the notion that the FLSA extends to every individual who performs productive work for an employer. "The [statutory] definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). A finding otherwise would inappropriately "sweep under the Act each person who, without

promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." *Id.* The Court there held that trainees for a railroad company were not required to be paid wages, even though they performed the actual work of brakemen, and even though the training was required in order for an individual to be allowed into the pool from which the railroad drew brakemen for paid employment. *Id.* at 149.

Repeatedly in the decades since, in cases that plaintiffs do not attempt to distinguish or even acknowledge, ***seven federal circuits*** (including the Second) have drawn on *Walling* to hold that the requirement of pay under the FLSA, even in for-profit companies, turns on a balancing test that assesses whether the individual or the employer gains greater benefit from the experience. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 326, 330 (2d Cir. 2012) ("whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity" and a key consideration in the analysis asks "who is the primary recipient of the benefits from the relationship") (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008)); *Solis v. Laurelbrook Sanitarium & School, Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) ("in our view, [the decision in *Walling*] rested upon whether the trainees received the primary benefit of the work they performed"); *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (court considered the "totality of the economic circumstances" to determine that student enrolled in residential school was not entitled under FLSA to minimum wage for performing chores that were integral part of educational curriculum, as chores were primarily for students' benefit, even though having students perform chores defrayed costs that school would have incurred in hiring workers to do tasks); *McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989) (reviewing

- 7 -

Fourth Circuit cases and holding that "this court has concluded that the general test . . . is whether the employee or the employer is the primary beneficiary"); *see also Kaplan v. Code Blue Billing & Coding, Inc.*, 504 Fed. Appx. 831, 834 (11th Cir. 2013) (applying an "economic realities" test and  balancing benefits to the employer against inefficiencies the interns caused); *Reich v. Parker Fire Protection Dist.*, 992 F. 2d 1023, 1026-27 (10th Cir. 1993) (analogizing trainee analysis to independent contractor cases, and holding that a "totality of the circumstances" test applies); *Donovan v. American Airlines, Inc.*, 686 F.2d 267, 272 (5th Cir. 1982) (approving the district court's analysis of the "relative benefits flowing to trainee and company during the training period").[9]  No circuit has come to a different conclusion.[10]

Gawker's liability in this case to any plaintiff, therefore, depends on whether the company or the intern derived greater benefit from the experience.  That simply is not an analysis that can be conducted on an aggregate or representative basis.  *See, e.g.*, *Myers v. Hertz Corp.*, 624 F.3d 537, 544 (2010).[11]  Even the abbreviated record now before the Court

---

[9] District courts have largely adopted the same test.  *See, e.g.*, *Wang v. Hearst Corp.*, No. 12 Civ. 793, 2013 WL 1903787 (S.D.N.Y. May 8, 2013) (Baer, J.) ("the prevailing view is the totality of the circumstances test"); *Cleveland v. City of Elmendorf*, 2004 WL 305609, at *9 (W.D. Tex. Jan. 23, 2004) ("because the FLSA was 'not intended to sweep everyone under the minimum wage umbrella,' courts must perform a common sense reading of the applicable law and consider the totality of the circumstances of the parties' relationships so as to avoid obviously absurd application of the statute"); *Todaro v. Township of Union*, 27 F. Supp. 2d 517 (D.N.J. 1999) (characterizing *Walling* as "concluding that participation in [the] railroad training program did not constitute employment under FLSA where [the] primary benefit redounded to trainees").

[10] Relatedly, the Second and First Circuits have held that an admitted employee may also serve in an unpaid, volunteer capacity for the same employer, performing other tasks for his own pleasure or benefit.  *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 523-524 (2d Cir. 1998); *Roman v. Maietta Constr.*, 147 F.3d 71, 75 (1st Cir. 1998).

[11] *Id*. at 544 (quoting *Myers v. Hertz Corp.*, No. 02-CV-4325 (DRH) (MLO), slip op. at 9 (E.D.N.Y. May 18, 2006)) (affirming district court's finding that "because liability as to each putative plaintiff depends upon whether that plaintiff was correctly classified as exempt . . ., any collective action would require the Court to make a fact-intensive inquiry into each potential plaintiff's employment situation.  Thus, regardless of the possibility that other Station Managers are improperly being classified as exempt . . ., any determination as to their right to overtime would require a highly individualized analysis as to whether the duties they performed fell within that exemption").

demonstrates the multitude of individualized issues that preclude class treatment.  Plaintiffs

submit declarations claiming that they acted as employees and that Gawker benefitted from their

work (though they do not address, even to deny it, whether they also received any benefit from

their internships); Gawker has submitted declarations from Plaintiffs' supervisors rebutting their

allegations, and from former interns who had different experiences.

Plaintiff Aulistar Mark, for example, testifies in general terms that he was no different

from any other employee and received no education from his internship.  His supervisor, Stephen

Totilo, contradicts that claim, testifying that Mark received "a good introduction on how to find

stories, craft headlines, write articles and publish them, and deal with the reaction from the

public"; that Mark's work was closely supervised; and that Mark received college credit for his

internship.  Totilo Decl. ¶¶5, 9-11.  A jury could listen to the conflicting testimony from Mark

and from Totilo and make a decision about whether Gawker or Mark received the greater benefit

from his internship.  But answering that question would say nothing about the primary

beneficiary of any other Plaintiff's internship, nor of any of the hundreds of other internships, at

other websites, involving other supervisors making their own decisions about the degree of each

intern's responsibilities and the benefits of that experience to those hundreds of other unnamed

interns.  The same is true of the factual disputes between each of the three other Plaintiffs and

their respective supervisors: the benefits they each received, or did not, are disputed questions of

fact that may vary from one Plaintiff to another.  This case simply is not suitable for resolution

on a representative basis.

The uncontested evidence before the Court is that Gawker's internships were not

centrally controlled; each website made its own decisions about intern recruitment, training, and

responsibilities, and each supervisor even within a given website had the authority to train interns and request work from them as he or she thought appropriate. *See, e.g.*, Kidder Decl. ¶4.

That decentralized approach, not surprisingly, resulted in different experiences: while Plaintiffs uniformly insist (largely using the same words, in fact) that they were indistinguishable from employees, other interns derived great educational benefits from their experiences and credit their internships with launching their careers.  See, e.g., J. Ma Decl. ¶¶7, 9; Q. Ma Decl. ¶¶8, 11; Annis Decl. ¶10.  The point is not that Plaintiffs' accounts are untrustworthy, but rather that, even taking Plaintiffs' declarations as entirely accurate, they do not reflect the universal experience of the group they purport to represent.

Gawker does not take the position that FLSA claims by unpaid interns are categorically inappropriate for class treatment.  Hypothetically, a company could treat interns so rigidly in the same way, subjecting them to centralized, detailed, universally-applied requirements and procedures, that a decision about one intern's experience would suffice to determine the primary beneficiary of all such interns' experiences.  But the law governing unpaid internships complicates such efforts, because it does not impose any black-and-white rules: it requires a flexible analysis of relative benefit, a matter that – as the current record shows – requires resolution of individualized factual questions.  Mark, Lu, and the other Plaintiffs cannot represent those individuals, or tell their stories.  The collective cannot be certified.

## 2.    Plaintiffs' Proposed Test Ignores The Law.

Hoping to paper over the factual diversity among interns and the inevitably fact-specific balancing test that governs their claims, Plaintiffs urge the Court not to adopt the "primary beneficiary" test, despite its essentially universal acceptance.  Plaintiffs rest their argument on a single district court decision, *Glatt v. Fox Searchlight Pictures, Inc*., No. 11 Civ. 6784, 2013 WL

2495140 (S.D.N.Y. June 11, 2013).  *Glatt*'s summary rejection of decades of settled precedent –
a position no other court has taken – should not be followed, for several reasons.

First, *Glatt* rigidly applies the six-factor test set forth in the U.S. Department of Labor's
Fact Sheet No. 71 (attached to Plaintiffs' papers as Paparella Decl. Ex. 2), requiring that all six
of those factors be satisfied to exempt an unpaid internship from the FLSA.  No other decision
does so, and *Glatt* ignores without comment the six federal circuit decisions that apply a primary
beneficiary analysis.  *Glatt* also ignores the express rejection of the DOL Fact Sheet as a
comprehensive or exclusive checklist in several of those cases.  In *Laurelbrook*, for example, the
Sixth Circuit found the DOL test "a poor method for determining employee status" because it is
"overly rigid and inconsistent with a totality-of-the-circumstances approach," "inconsistent with
prior WHD interpretations and opinions endorsing a flexible approach" (and therefore not
entitled to deference), and inconsistent with the Supreme Court's decision in *Walling*.  The Tenth
Circuit in *Parker Fire Protection District* similarly found DOL's test inconsistent with its own
rulings and with *Walling*, commenting that "there is nothing in [*Walling*] to support an 'all or
nothing' approach."  992 F.2d at 1026-27.

Second, and perhaps more revealingly, *Glatt* refused to apply the governing test because
it found a primary beneficiary analysis "unmanageable."  The court objected that under such a
test, "the very same internship position might be compensable as to one intern, who took little
from the experience, and not compensable as to another, who learned a lot."  Slip op. at 22.  That
is true, but that is what the primary beneficiary test requires.  If that is "unmanageable," then the
answer is to deny class certification, not to adopt a discredited view of the law that a court
considers to be better policy or more convenient.  The *Glatt* court's result-oriented approach

inverts the proper analysis, changing the law to permit class certification instead of assessing whether certification is appropriate under governing law.

The primary beneficiary test does indeed require an individual-by-individual assessment, but so do many FLSA requirements. As the Second Circuit held in *Myers*, for example, classification of an employee as exempt may require individualized analysis. *See* 624 F.3d at 544. Whether an individual is an employee or lawfully treated as an independent contractor also may require consideration of each individual's circumstances, even where all work for the same company doing the same job. *See, e.g., Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181 (S.D.N.Y. 2010) (denying certification of proposed class of newspaper carriers). Even simple overtime cases can require case-by-case factual assessments that preclude class certification.[12] The answer in such cases, as here, is to deny certification, not to change long-accepted law so as to facilitate it.[13] *Glatt* simply misstates the law.

**B.     Plaintiffs Have Failed To Show That They Are Similarly Situated To The Proposed Collective.**

Plaintiffs support their motion with evidence in three categories: internship recruitment postings, Plaintiffs' four cookie-cutter declarations, and emails. None of these items, individually or collectively, suffices to demonstrate that the proposed collective is similarly situated, as required by the FLSA.

---

[12] *See, e.g.*, *Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 322-25 (E.D.N.Y. 2012); *Brickey v. Dolgencorp, Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011); *Eng-Hatcher v. Sprint Nextel Corp.*, 2009 WL 7311383 (S.D.N.Y. 2009).

[13] *Glatt*'s analysis thus violates the Rules Enabling Act, 28 U.S.C. §2072(b), which provides that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." Gawker has a substantive right to an individual determination of its liability under the primary beneficiary test, and discarding that legal rule in order to facilitate class certification, as *Glatt* did, elevates the convenience of Rule 23 above the law.

1.      **The Internship Postings Are Either Irrelevant Or Support Gawker's Position.**

Plaintiffs begin with what they call "job postings," but these documents do not assist them, because the advertisements are fully consistent with Gawker's position that its internships complied with the law and that the claims here are too individualized to permit collective treatment.   In any case, the postings are of limited value, because the question on the merits – and thus the question on which the plaintiffs must prove they are similarly situated to the proposed collective[14] – will be whether Gawker or each intern was the primary beneficiary of the internship as it was actually carried out, not as Gawker advertised it.   *See, e.g.*, *Guillen*, 750 F. Supp. 2d at 476 ("it is not sufficient for [plaintiff] to show that he and the proposed class operated under the same job description"); *Anglada v. Linens 'n Things*, 2007 WL 1552511, at *5-6 (S.D.N.Y. Apr. 26, 2007).   Indeed, even *Glatt*, on which Plaintiffs so heavily rely otherwise, rejected the relevance of intern postings, holding that a common description of an internship position, which does not describe the actual duties or experience of any particular intern, "is not capable of resolving any question."   2013 WL 2495140, at *15.

Even if intern advertisements were relevant, the postings which Plaintiffs discuss do not assist their argument.   They begin with a posting dated January 25, 2011, which requests intern candidates "interested in learning about online media, online marketing, or both."   Paparella Decl. Ex. 1; see Pl. Mem. at 4-5.   The request thus is for individuals who want to learn – that is, who want to receive a benefit from an internship, not merely those willing to work hard to

---

[14] *See, e.g.*, *Colozzi v. St. Joseph's Hospital Health Center*, 595 F. Supp. 2d 200, 207 (2009) ("The similarly situated analysis, then, centers upon the features which make the particular policy or practice unlawful."); *Guillen v. Marshalls of MA, Inc.*, 841 F. Supp. 2d 797, 801-802 (S.D.N.Y. 2012) ( "a collective action is inappropriate as to all employees of a common employer without a showing that the other employees are similarly situated to the plaintiff ***with respect to the harm suffered by that plaintiff***") (emphasis added) (citing *Baum v. Shoney's Inc.*, 1998 WL 968390 (M.D. Fla. Dec. 3, 1998); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008); *Morales v. Plantworks, Inc.*, 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006)).

advance Gawker's interests.  The posting indicates that interns will "assist" with a few tasks, remaining vague about exactly what the interns will do or whether, in plaintiffs' terms, Gawker will receive any "immediate benefit" from the interns' assistance.  The posting goes on to list eight categories of things that the intern "[will] learn from our Editorial Marketing Team," all of which are transferable skills likely to be useful not merely at Gawker but at any online media business.  The posting thus describes an internship entirely consistent with what plaintiffs say (inaccurately) the law requires: an experience designed entirely for their benefit.

The next posting similarly seeks interns "to learn about our commenting system," and offers to teach interns "behind-the-scenes administrative tasks and quality oversight under direction by our Community Manager."  Paparella Decl. Ex. 1; *see* Pl. Mem. at 5-6.  The posting thus again is phrased in terms of an experience that will benefit the intern rather than Gawker, and offers college credit to those who qualify, further attesting to the educational value of the experience.

Plaintiffs make much of the tongue-in-cheek tone of a January 2010 posting in which Gawker deprecates the value of the intern experience, but Plaintiffs' unwillingness or inability to see through the sarcasm does not render the posting helpful to their position.  The posting describes an internship that "won't involve making copies or sending faxes," but rather offers "an opportunity to learn how to collect and organize information, and how to tell people things they don't already know."  Paparella Decl. Ex. 1; *see* Pl. Mem. at 6-7.  This posting, too, offers college credit.  Leaving aside the jesting phrasing, the announcement again seeks to entice interns with an educational opportunity.

None of these postings supports the weight Plaintiffs want to place on them as evidence that Gawker internships uniformly sought to transfer the work of regular employees to unpaid

interns who would be "integral to operations."  Pl. Mem. at 7.  To the contrary, the postings

almost entirely promote what an intern will get out of the experience.  Further, and more

importantly for the current motion, the postings do nothing to show that all Gawker internships

were the same, or that the balance of benefits likely tipped the same way for all interns at all

Gawker websites.  The postings thus do not assist Plaintiffs in meeting their burden of

demonstrating that the many interns they hope to represent are similarly situated.

### 2.   Plaintiffs' Conclusory Declarations Add Nothing.

Plaintiffs next point to two statements in each of their declarations, in which they attest

(in identical wording) that "[upon] information and belief, Gawker derived an immediate benefit

from my work," and that they "believe" that other interns working for other supervisors at other

Gawker websites "generally engaged in the same core work that I did."  Pl. Mem. at 8.  Neither

of these statements offers relevant information.

At the outset, allegations made on "information and belief" do not support certification;

they are "exactly the type of 'unsupported assertion[ ]' that, according to the Second Circuit,

'cannot . . . satisf[y]' a plaintiff's burden at the preliminary certification stage."[15]

---

[15] *Ikikhueme v. CulinArt, Inc.*, No. 13 Civ. 293 (JMF), 2013 WL 2395020, at *2 (S.D.N.Y. June 3, 2013) (quoting *Myers*, 624 F.3d at 554).  *See also Silva v. Calle 8, LLC*, 2013 WL 6330848, at *2 (E.D.N.Y. Dec. 5, 2013) ("Affidavits containing class allegations that [are] not made on personal knowledge, but instead based on information or belief are not sufficient to make the required factual showing of a common plan or policy") (internal quotations omitted); *Fernandez v. Wells Fargo Bank,* 12-cv-7193, 2013 WL 4540521, at *8 (S.D.N.Y. Aug. 28, 2013) (declaration stating that plaintiff "was aware of" similarly situated individuals was insufficient evidence because it lacked specificity as to dates or the identity of any of the individuals who were allegedly subjected to a common policy); *Kahn v. Airport Management Servs. LLC*, No. 10 Civ. 7735 (NRB), 2011 WL 5597371, at *4 (S.D.N.Y. 2011) (rejecting plaintiffs' declarations attesting that they were "aware and have personal knowledge of" similarly situated employees); *Guillen*, 750 F. Supp. 2d at 475 (plaintiff's hearsay statements about what he believed other individuals' duties were in NY deemed insufficient to show the plaintiffs were similarly situated to ASMs in other states); *Barfield*, 2005 WL 3098730, at *1 (disregarding hearsay evidence of compensation policy).

Plaintiffs' hesitant language makes clear that they are in no position to speak about any other intern.  Their declarations are similarly inadequate on other points.  They allege only "[b]ased on my information and belief" that all Gawker websites used the same technology, that the majority of entry-level employees worked in New York, that Plaintiffs' duties were the same as paid employees, that Gawker would otherwise have had to pay an employee to do the things that they did, and that other interns worked at least fifteen hours per week.[16]  They express similar uncertainty about the allegations that other interns received assignments similarly and had the same supervision ("[i]t is my understanding"); that assignments did not take longer to explain than Plaintiffs "would expect" would be necessary for an employee; that they were "aware of" other unnamed interns alleging performing similar work; and that they "never heard" of interns receiving minimum wage.[17]

Stripped of these qualified statements, Plaintiffs' declarations are left with affirmations that do not even establish their own claims.  In summary, they merely describe their own experiences (primarily researching and writing), name their supervisors, and state the websites where they interned.  All of those allegations, however, are consistent with an internship in which they received greater benefit than Gawker did – as their supervisors attest.  Unable to satisfy the legal test even with respect to their own claims, and lacking any concrete information about the experiences of any other intern, Plaintiffs' declarations fail to offer any basis for conditional certification.

---

[16] Hudson Decl. ¶¶3, 4, 20, 27, 35; Lu Decl. ¶¶3, 4, 11, 25, 32, 40; Mark Decl. ¶¶3, 4, 25, 33, 40; Matthews Decl. ¶¶3, 4, 20, 27, 35.  *See also* Lu Decl. ¶13 (expressing an "understanding" that interns and employees received the same training and manuals), ¶39 (claiming to be "aware" of other interns "similarly situated to me").

[17] Hudson Decl. ¶¶7, 25, 34, 36; Lu Decl. ¶¶7, 30, 39, 41; Mark Decl. ¶¶31, 41; Matthews Decl. ¶¶7, 10, 25, 34, 36.

### 3. The Emails Plaintiffs Submit Do Not Suggest A Similarly Situated Collective.

The emails from former Gawker editor Kaila Hale-Stern similarly fail to suggest any group of interns who were not the primary beneficiaries of their internships. In the emails to which Plaintiffs refer (see Pl. Mem. at 8-10), Ms. Hale-Stern provides guidance on how to police comments on Gawker blog posts, describing the line between appropriate and inappropriate comments, and how to respond to them; asks interns to limit their activities until they are introduced to editors; and invites but does not require feedback on the tools the interns are using. None of this is inconsistent with an educational, intern-benefitting experience. That Ms. Hale-Stern provides advice similar to what she "tell[s] editors and writers," Pl. Mem. at 9, does not suggest that interns are indistinguishable from employees, but only that they are receiving advice that would be useful to them in a paid position – exactly the sort of education that a lawful internship is supposed to provide. The emails also emphasize the voluntary nature of the tasks described, as when Ms. Hale-Stern writes that "[y]ou're welcome to opt out." Pl. Mem. at 10.

Further, Plaintiffs fail to identify the interns who were recipients of these emails. Plaintiff Lu appears by name in one exchange, but otherwise the recipients are not at all clear. Did these emails go only to interns at the Gawker weblog, and not to its sister websites, or to all interns? How many interns in total received them? Even if the emails stood for the proposition for which Plaintiffs cite them, they still would contribute little to the relevant analysis.

Plaintiffs' burden is to demonstrate that they are "similarly situated" to the collective they hope to represent, meaning that all of them "were victims of a common policy or plan that violated the law." *Myers,* 624 F.3d at 555 (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.)). Although that burden regularly is described as "modest," "a court must nonetheless take a measured approached when addressing a request for collective

- 17 -

action certification, mindful of the potential burden associated with defending against an FLSA claim involving a broadly defined collective group of plaintiffs."[18]  As described in the following section, Gawker's evidence further demonstrates the unsuitability of this case for class treatment. But Plaintiffs fail to offer anything more than "unsupported assertions" in support of their motion, and conditional certification should be denied on that basis alone.

### C.   The Record As A Whole Demonstrates That Plaintiffs' Claims Turn On An Individualized Analysis, The Antithesis Of A Collective Claim.

Even if Plaintiffs' own evidence suggested a uniform collective of interns who worked primarily for Gawker's benefit, which it does not, Gawker's evidence further demonstrates that no conclusions can be drawn about those individuals' claims on a representative basis.  There simply is too much variation among the members of the proposed collective on facts that may determine liability to justify aggregating their claims.

### 1.   College credit.  For example, some interns (including Plaintiffs Mark and Lu, at least according to their representations to Gawker) received college credit for their internships, while others (apparently including Plaintiffs Hudson and Matthews) did not.[19]  College credit is a significant factor in balancing the benefits of the internship, because such interns not only get the benefit of learning about the business, but also take a tangible step toward their college degree.  The willingness of an academic institution to grant credit for an internship also constitutes a judgment by that institution that the internship has a worthwhile educational

---

[18] *Colozzi*, 595 F. Supp. 2d at 207 (internal citations omitted).  *See also Guillen*, 841 F. Supp. 2d at 803 ("it would be a waste of the [c]ourt's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated").

[19] Totilo Decl. Ex. A, B; Blakeley Decl. ¶7; J. Ma Decl. ¶3; *cf.* Newitz Decl. ¶5 (no strict policy, but website io9 preferred that interns be eligible for credit).

purpose – so much so that the U.S. Department of Labor, despite its improperly rigid test, has taken the position that unpaid internships for credit generally are permissible:

> In situations where students receive college credits applicable toward graduation when they volunteer to perform internships under a college program, and the program involves the students in real life situations and provides the students with educational experiences unobtainable in a classroom setting, we do not believe that an employment relationship exists between the students and the facility providing the instruction.

DOL Opinion Letter, 1996 WL 1031777 (May 8, 1996).[20]

2.    **Payment**.  Similarly, some interns at Gawker websites were paid, and others were not.[21]  There were thus multiple possibilities: some interns received pay but no college credit, *e.g.*, Q. Ma Decl. ¶4; others received credit but no pay, *see* Blakeley Decl. ¶7; and some received neither pay nor credit, *see, e.g.*, Annis Decl. ¶6.

Those interns who received some payment, whether per-post or a stipend, have even more individual issues than those who received no pay, because they pose the additional question whether, even if they should have been classified as employees, they were paid at least minimum wage.  That is not merely a question of damages, which some courts have declined to consider at class certification; it is a question of liability.[22]  Merely labeling someone an "intern" rather than an "employee" does not, in itself, violate the FLSA; the statute requires only that an individual who is an employee within the meaning of the statute be paid at least minimum wage for all hours worked.  Thus an intern who received some pay cannot establish an FLSA violation

---

[20] *See also* DOL Opinion Letter, 1995 WL 1032496 (July 11, 1995) (same); DOL Opinion Letter, 1970 WL 26388 (March 31, 1970) ("this Department will not assert that a student studying to become an interior designer is an employee of a firm when engaged in on the job training or work experience which is a prescribed part of the curriculum of instruction established for such a program of study").

[21] *See, e.g.*, Ramirez Decl. ¶4 (paid $100 per day); Q. Ma Decl. ¶4 (paid $200 per month); Kidder Decl. ¶5 (some paid, some not, according to the whims of each site).

[22] The Supreme Court recently has suggested, however, that significant variation in damages among the proposed class alone may be sufficient reason to deny class certification under Fed. R. Civ. P. 23.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

merely by showing that she should have been classified as an "employee"; to establish liability, she must also show that the amount she was paid was less than the law required. The variation in pay among members of the proposed collective thus further precludes certification, as it raises additional factual questions about how many hours the intern put in at the internship and whether the pay was sufficient to cover those hours at the statutory minimum.

      **3.**     **Decentralized Programs**. The uncontested evidence shows that Gawker had no single, monolithic intern "program." Kidder Decl. ¶4. The intern practices at individual websites varied widely, from the persistent daily and weekly training sessions that made up the "detailed training program" at GawkerTV and the "formal" training at io9 (Blakeley Decl. ¶4; Newitz Decl. ¶8) to practices at other sites that were so informal and unorganized that none of them could be called a "program," consisting primarily of day-to-day feedback and instruction. Gordon Decl. ¶10; Q. Ma Decl. ¶¶6-7; Craggs Decl. ¶4 ("Anyone who worked at Deadspin could supervise interns. . . . [T]here was no formal internship program"). Because they were so informal, the degree of supervision, the amount of productive work expected, and other criteria determinative of the legality of the internships varied from supervisor to supervisor and from intern to intern. Plaintiff Hudson complains that "[t]he editors for whom I worked generally expected me to work independently," Hudson Decl. ¶24, whereas Lifehacker Editor-in-Chief Whitson Gordon testifies that "most of the internship consisted of training" in the form of close supervision (which was not at all provided to employees). Gordon Decl. ¶¶10-11.

      In other words, here as in *Hearst*, "the record shows that there is no uniform policy among the [Gawker websites] with respect to the contents of the internship, including interns' duties, their training, and supervision, such that the analysis of four out of six DOL factors would have to be individualized." *Hearst*, slip op. at 11. The lack of any centralized, uniform program

precludes the Court or a jury from examining the internships of a sample of the proposed collective and making a single ruling on the legality of every internship.

4.   **Varying Experiences**.  The record also demonstrates that interns' experiences varied widely from person to person and website to website.  Former corporate intern Jesse Ma had no schedule and no minimum hours; he interned when he felt like it, either in the office or remotely as he chose.[23]  By contrast, GawkerTV interns "had a more regular schedule than other interns," generally in the office two days per week from 9 a.m. to 5 p.m., Annis Decl. ¶7, and a ten-hour-minimum schedule at io9 was "fixed," Newitz Decl. ¶6.  The Plaintiffs assert that they were "required to work" differing amounts ranging from 15 hours per week (comparable to the GawkerTV interns) to 25 hours per week.[24]  In any case, schedules and expectations of interns as to time commitment varied widely.

The benefits of internship also apparently varied.  The four Plaintiffs claim to have learned little in their internships apart from the sort of education that any employee would have received, and generally that they were treated no differently than employees.  Assuming that testimony to be accurate, it does not represent the universal experience.  At Lifehacker, interns received far greater attention, including constant supervision of their work, and while employees were expected to post directly to the website without supervision, interns were prohibited from publishing anything without editorial review.  Gordon Decl. ¶¶10-11; *see also* Annis Decl. ¶12

---

[23] J. Ma Decl. ¶5; see also Gordon Decl. ¶3 ("I made my own hours"); Craggs Decl. ¶4 ("they were not required to be there during any set hours . . . [t]hey came into the office when they were available and stayed for as long as they wanted").

[24] Hudson Decl. ¶31 (24 hours); Lu Decl. ¶36 (15 hours); Mark Decl. ¶37 (20 hours); Matthews Decl. ¶31 (25 hours).  There may be some doubt about Mark's hours; in a June 16, 2010 email to his supervisor, he asked the supervisor to lie on the timesheets he was submitting for school credit to represent that he was working higher hours so that he could earn credit and $7,200 in financial aid to which he otherwise was not entitled.  Totilo Decl. Ex. B.  That is precisely the sort of individualized issue that precludes class certification.

(GawkerTV interns could not post to the site because they were denied access to the tools used to do so); Newitz Decl. ¶9 (describing an "interactive" review process for intern articles); Craggs Decl. ¶5 (employees were expected "to produce much cleaner copy and to require much less handholding").  Thus, the interns at LifeHacker and GawkerTV, at least, caused more work for their supervisors than employees, because their written work required attention and feedback that employees' articles did not.  Similarly, the Plaintiffs unwillingness to concede any educational benefit contrasts starkly with others' experiences.  *See, e.g.*, Annis Decl. ¶13 (internship was "extremely beneficial and educational"); J. Ma Decl. ¶7 (a "very special opportunity"); Q. Ma Decl. ¶6 (lauding "constant tips and constructive feedback"); Blakeley Decl. ¶8 ("huge benefit to the interns," including how to identify stories and how to write "compelling, concise posts").

     **5.**    **Individual Factual Disputes**.  The record also reveals factual disputes between the plaintiffs and their supervisors about the quality of their experiences.  These disagreements serve as examples of the mini-trials that are necessary to resolve Gawker's liability to individual interns, and thus the unsuitability of this case for aggregate treatment.

     As discussed in Part A.1., above, Mark's comments about his internship cannot be squared with the testimony of his supervisor, who attests that Mark actually derived substantial education from the experience.  Similarly, former supervisor Blakely testifies that the training program at GawkerTV, where Plaintiff Matthews interned, taught interns "the building blocks and basic principles of how a publication works that the interns would not learn in a classroom setting."  Blakely Decl. ¶4.  He also testifies that Matthews was "lazy," failed to take direction, was "not very good," and "failed to do the simple work he was supposed to do." *Id*. ¶10.[25]  If

---

[25] Thomas Craggs had a similar experience with Matthews in a Deadspin internship, testifying that he was "uninterested" in the video work that was offered, and the writing he chose to do instead "required a fair amount of editing" and "took up a significant amount of time").  Craggs Decl. ¶10.

Matthews derived little benefit from his internships, therefore, it may be not because the internships were designed to benefit Gawker at his expense, but rather because he refused to take advantage of the educational opportunities offered to him. *See also* Gordon Decl. ¶16 ("The interns got out of the internship what they put into it."). A jury might decide that question either way; the point is that Gawker's liability to Matthews turns on facts that are peculiar to his situation.

Meredith Woerner, an editor at Gawker website io9, testifies that interns "made my job harder," rather than assisting, and Plaintiff Hudson seems to have fit that description. Woerner Decl. ¶13; *see id.* ¶¶12-15. Hudson's experience may have suffered as a result. *See id.* ¶¶13, 16. He complains here that he was to write and post articles just as employees do, but Ms. Woerner testifies that he posted material without permission that needed "significant attention and editing." *Id.* ¶14; *see also* Newitz Decl. ¶15. Ms. Woerner testifies that Mr. Hudson nevertheless learned a great deal in the internship, but would have learned more if he had tried harder. *Id.* ¶16. Again, Mr. Hudson may dispute this testimony; but the question of whether his internship was lawful requires resolution of those particular factual disputes, and doing so says nothing about the legality of any other internship.

*     *     *

In sum, there is no common thread that ties all of the interns in the proposed collective together. Even if interns who received some payment are excluded – and plaintiffs have not proposed to do that[26] – the only common element that clearly applies to all of the class members is that they were not paid. That is not enough, because the mere fact of nonpayment does not establish liability. As Judge Baer explained in *Hearst*, "[t]he evidence of a corporate-wide

---

[26] Plaintiffs propose to send notice to "all persons who have worked as interns for Gawker between June 21, 2010 and the date of final judgment in this action." Pl. Mem. at 24.

policy of classifying the proposed class members as unpaid interns is insufficient, as that policy alone cannot answer the liability question, which turns on what the interns did and what benefits they received during their internship."  2013 WL 1903787, slip op. at 9.  The answers to the questions that determine liability will vary from one class member to another.  That is not a collective action.  Plaintiffs' motion must be denied.

### D.    Should The Court Grant Certification It Should Not Accept Plaintiffs' Proposed Notice.

For the reasons explained above, certification should be denied.  Should the Court grant certification despite the welter of individual fact disputes and differing intern experiences, Gawker requests an opportunity to meet and confer with Plaintiffs' counsel concerning the proposed notice (Paparella Decl. Ex. 3).  In the event that such an opportunity is denied, Gawker here notes several objections to Plaintiffs' proposal.

First, plaintiffs propose an opt-in period of 75 days (or 60 days, according to page 6). Such a period unnecessarily delays resolution of this action, and is far in excess of the period normally permitted.  Numerous courts accordingly have held that thirty days is sufficient for this process.[27]  Second, plaintiffs begin with a bold heading that "[a] collective action lawsuit may affect your legal rights to unpaid wages."  That is not accurate; the collective action will have consequences only for those who opt in.  Those who choose not to do so are unaffected by the Plaintiffs' claims.  Third, the notice includes logos from Gawker's websites.  There is no need for the inclusion of these images, and their use suggests participation or endorsement by Gawker. Fourth, Question 5 on page 6 is confusing and should be deleted, since the notice would not be

---

[27] *See, e.g.*, *Daud v. Ichiban Japanese Restaurant*, 2010 U.S. Dist. LEXIS 101281, at *10-11 (D.N.J. Sept. 23, 2010); *Williams v. Long*, 585 F. Supp. 2d 679, 692 (D. Md. 2008); *Keef v. M.A. Morenson Co.*, 2008 U.S. Dist. LEXIS 59076, at *7 (D. Minn. Aug. 4, 2008); *Barron v. Henry County School System*, 242 F. Supp. 2d 1096, 1106 (M.D. Ala. 2003).

sent unless the collective is conditionally certified.  Fifth, Question 12 should be deleted, since it exceeds the limited purpose of court-authorized notice, inviting recipients to publicize the lawsuit and seek out additional plaintiffs.  Doing so compromises the statements that the Court has not endorsed plaintiffs' position and seeks to make recipients into agents of plaintiffs' counsel.

Finally, the Court should not toll the statute of limitations, as Plaintiffs propose. Congress required that the statute of limitations continue to run on an individual's claim until a written consent form is filed.  29 U.S.C. §§216(b), 256(a).  That was a conscious decision not to permit tolling, the rule that prevails under Fed. R. Civ. P. 23: "We find that by rejecting the Rule 23 class action procedure for [FLSA] claims, Congress also rejected the concomitant complaint-tolling rule of Rule 23."  *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996).  There are no particular circumstances in this case that require a different rule, and Plaintiffs offer none.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for conditional certification should be denied.

Dated:      January 10, 2014                          GAWKER MEDIA, LLC
                                                      NICK DENTON

                                                      By their attorneys,


                                                      By: */s/ Mark W. Batten*
                                                      Mark W. Batten
                                                      Alison M. Langlais
                                                      PROSKAUER ROSE LLP
                                                      One International Place
                                                      Boston, MA 02110
                                                      Phone: (6170 526-9850
                                                      Fax: (617) 526-9899
                                                      mbatten@proskauer.com
                                                      *Attorneys for Defendants*

- 25 -

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2014, a true copy of the foregoing was filed through the Court's electronic filing system (ECF) and was served upon all attorneys of record for each other party to this action through operation of such system.  It is available for viewing and downloading through the ECF system.

*/s/ Mark W. Batten*
Mark W. Batten