UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AULISTAR MARK and ANDREW HUDSON,
Individually and on behalf of All Others Similarly
Situated,

               Plaintiffs,

        -v-

GAWKER MEDIA LLC and NICK DENTON,

               Defendants.

------------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: AUG 1 5 2014 |

13-cv-4347 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Before the Court is Plaintiffs' motion for conditional certification and court-authorized

notice pursuant to § 216(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219.

Dkt. No. 15. For the following reasons, the motion is granted.

I.    Background

This action was originally filed on June 21, 2013 by Aulistar Mark, Hanchen Lu, and

Andrew Hudson, who worked in 2008 and 2010 as unpaid interns for blogs operated by

Defendants Gawker Media LLC and its founder and controlling owner Nick Denton

(collectively, "Gawker"). Dkt. No. 1. The complaint was later amended to add a fourth Plaintiff,

David Matthews, who also worked for Gawker as an unpaid intern. Dkt. No. 4.

Gawker is a media company based in New York City that publishes a number of popular

blogs. Am. Compl. ¶ 13. In their amended complaint, Plaintiffs allege that Gawker hired unpaid

and underpaid interns to perform work that was "central to Gawker's business model as an

internet publisher"—specifically, "writing, researching, editing, lodging stories and multimedia

content, promoting content on social sites, moderating the comments forum and managing the

community of Gawker users." *Id.* ¶ 5. Plaintiffs allege that Gawker's failure to pay its interns

the minimum wage for such work violated the FLSA and state labor laws. *Id.* ¶¶ 46–62.

Pursuant to § 216(b) of the FLSA, the amended complaint asserts minimum wage and

record-keeping claims on behalf of the named Plaintiffs and:

> all similarly situated persons who were designated as "interns" by Gawker who
> were not paid the legal minimum for their work on the Gawker Weblogs and who
> performed duties relating to the creation, promotion and/or management of
> content on behalf of Gawker, including but not limited to writing, researching,
> editing, lodging stories and multimedia content, promoting content on social sites,
> moderating the comments forum and managing the community of Gawker users,
> during the period between three years prior to the filing of this Complaint and
> until the date of final adjudication of this action.

Am. Compl. ¶¶ 16, 46–52. Plaintiffs also assert similar claims under the New York Labor Law

on behalf of two classes of Gawker interns who performed the work described above: ones who

worked for Gawker in New York and ones who worked remotely from different locations within

the United States. *Id.* ¶¶ 17–18, 53–57. Plaintiffs also bring claims for violations of "applicable

State labor law" on behalf of the latter class of interns. *Id.* ¶¶ 58–62.

Plaintiffs filed the instant motion for conditional certification and court-authorized notice

on December 10, 2013, and it was fully submitted on January 18, 2014. With the Court's

permission, Gawker filed a surreply on May 21, 2014, to which Plaintiffs responded on May 27,

2014. Since Plaintiffs' motion was filed, Matthews and Lu have signed stipulations dismissing

their claims with prejudice. Dkt. Nos. 45, 65. Nonetheless, the Court will sometimes refer to Lu

and Matthews along with Mark and Hudson as "Plaintiffs" for simplicity's sake.

## II.    Legal Standard

The FLSA authorizes workers to sue on behalf of both themselves and "other employees

similarly situated." 29 U.S.C. § 216(b). District courts have discretion to facilitate this

collective action mechanism by authorizing that notice be sent to potential plaintiffs informing them of "the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010). In this Circuit, district courts follow a two-step approach in exercising their discretion. First, the court will make "an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* at 555. Second, after additional plaintiffs have opted in, "the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Id.* If they are not, then the action may be "de-certified." *Id.*

Plaintiffs' motion involves the initial determination of whether to send notice to a group of potential opt-in plaintiffs.[1] To demonstrate that there are other "similarly situated" individuals, Plaintiffs need only make a "'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (Sotomayor, J.)). Plaintiffs can meet this burden by presenting evidence that there are other individuals with similar positions, job requirements, pay provisions, and the like; there must be an "identifiable factual nexus which binds [the named plaintiffs] and potential class members together as victims of a particular practice." *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12-cv-5651 (AJN), 2013 WL 3466810, at *2 (S.D.N.Y. July 8, 2013) (quoting *Ali v. N.Y.C. Health &*

---

[1] "[W]hile courts speak of 'certifying' a FLSA collective action, it is important to stress that the 'certification' we refer to here is only the district court's exercise of the discretionary power . . . to facilitate the sending of notice to potential class members." *Myers*, 624 F.3d at 555 n.10.

*Hosps. Corp.*, No. 11–cv–6393 (PAC), 2013 WL 1245543, at *3 (S.D.N.Y. Mar. 27, 2013))
(internal quotation mark omitted).

Plaintiffs' burden at this stage is low, but "it is not non-existent," and they cannot rely
only upon "unsupported assertions." *Id.* (quoting *Ali*, 2013 WL 1245543, at *2). "Plaintiffs may
satisfy their 'minimal' burden by relying on their own pleadings and affidavits, or the affidavits
of potential members of the collective action." *Grant v. Warner Music Grp. Corp.*, No. 13-cv-
4449 (PGG), 2014 WL 1918602, at *3 (S.D.N.Y. May 13, 2014). At this early stage, "the court
does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make
credibility determinations." *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368
(S.D.N.Y. 2007).

## III.   Discussion

Although the Court is not permitted to consider the merits of Plaintiffs' claims at this
stage, the law governing whether Gawker will ultimately be liable to Plaintiffs is nonetheless
relevant to the Court's inquiry, because authorizing notice to potential opt-in plaintiffs is
appropriate only upon a sufficient showing that there are individuals who are similarly situated to
Plaintiffs "with respect to whether a FLSA violation has occurred." *Myers*, 624 F.3d at 555; *see
Fraticelli v. MSG Holdings, L.P.*, No. 13-cv-6518 (JMF), 2014 WL 1807105, at *2 (S.D.N.Y.
May 7, 2014). The question of whether potential opt-in plaintiffs are similarly situated to
Plaintiffs therefore depends in part on what constitutes a FLSA violation. In this case, because
Gawker allegedly did not pay its interns or underpaid them, the latter question depends chiefly
on whether Gawker's interns were "employees" under the FLSA. *See* 29 U.S.C. § 206 (setting
minimum wages that "[e]very employer shall pay to each of his employees").

4

The parties agree that Plaintiffs' status as employees turns on the scope of the "trainee exception" that the Supreme Court recognized in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947).  In *Walling*, the defendant was a railroad that had "[f]or many years . . . given a course of practical training to prospective yard brakemen." *Id.* at 149.  A group of trainee brakemen, who were not paid, brought claims against the railroad for violating the FLSA, but the Supreme Court rejected their claims, holding that the trainees were not employees.  The Court reasoned that the FLSA's definition of employee was "obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Id.* at 152.  Such a broad definition would, for example, mean that students "working" purely for their own benefit at a school or college would be considered employees of the school or college. *Id.*  The trainees were, in effect, students: they benefited from "instruction" provided by the railroad, and the railroad itself received "no 'immediate advantage' from the work done by the trainees." *Id.* at 153.  The Supreme Court also recognized, however, that a trainee might qualify as an employee if the "employer has evasively accepted the services of beginners at pay less than the legal minimum." *Id.*

In arguing that Gawker's interns do not fall within the trainee exception, Plaintiffs point to a six-factor test set forth in a Department of Labor ("DOL") fact sheet. *See* Pl. Br. at 14–15. According to the fact sheet, an intern need not be paid if "all of" these factors are met:

1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2. The internship experience is for the benefit of the intern;

3. The intern does not displace regular employees, but works under close supervision of existing staff;

4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5

5. The intern is not necessarily entitled to a job at the conclusion of the internship; and

6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

Paparella Decl. Ex. 3. These factors provide a structured way of determining whether an intern qualifies as an employee, and some courts have adopted them as a reasonable interpretation of the FLSA promulgated by the agency charged with administering it.[2] *See Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 532–33 & n.61 (S.D.N.Y. 2013), *modified on other grounds on reconsideration*, 2013 WL 4834428 (S.D.N.Y. Aug. 26, 2013); *Archie v. Grand Cent. P'ship*, 997 F. Supp. 504, 531–32 (S.D.N.Y. 1998) (Sotomayor, J.); *see also Wang v. Hearst Corp.*, 293 F.R.D. 489, 493–94 (S.D.N.Y. 2013) (adopting a "totality of the circumstances" test for which the six DOL factors supply a "framework for an analysis").

For its part, Gawker argues that the DOL fact sheet is inconsistent with the decisions of several circuit courts of appeals, which Gawker characterizes as adopting a "primary beneficiary" test under which courts determine who received the greater benefit from the internship: the intern or the company where the intern worked. Def. Opp. at 6–12; *see, e.g., Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 525 (6th Cir. 2011) ("We find the [DOL's] test to be a poor method for determining employee status in a training or educational setting. For starters, it is overly rigid and inconsistent with a totality-of-the-circumstances approach, where

---

[2] The precise formulation of the test has changed over the years, but "the same six factors 'have appeared in Wage and Hour Administrator opinions since at least 1967.'" *Glatt*, 293 F.R.D at 532 n.61 (quoting *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1027 (10th Cir. 1993)). Some courts that have looked to the fact sheet have afforded it deference only according to its "power to persuade" pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), as opposed to *Chevron* deference, *see, e.g., Wang*, 293 F.R.D. at 494; *cf. Reich*, 992 F.2d at 1026–27 (finding that factors deserved little deference under *Skidmore*), although at least one court has cited *Chevron* in deciding to defer to the fact sheet, *see Archie*, 997 F. Supp. at 532. *See generally United States v. Mead Corp.*, 533 U.S. 218 (2001). The Court need not determine the correct test in this procedural posture (as explained in the text), so the deference question, while interesting, also does not require resolution.

no one factor (or the absence of one factor) controls."). Under the primary beneficiary test, Gawker argues, conditional certification is precluded as a matter of law because the trainee exception "simply is not an analysis that can be conducted on an aggregate or representative basis." Def. Opp. at 8.

At this stage, the Court need not definitely weigh in on this dispute, which is currently the subject of an appeal in the Second Circuit. *See Wang v. Hearst Corp.*, No. 13-4480 (2d Cir. filed Nov. 26, 2013). Gawker's argument proves too much, because it implies that FLSA cases in which the plaintiffs' status as "employees" is at issue are essentially never appropriate for conditional certification. *See* Def. Br. at 12 (comparing trainee exception to independent contractor analysis). But courts routinely certify FLSA collectives comprising plaintiffs who claim they were improperly classified as independent contractors.[3] *See, e.g., Ouedraogo*, 2013 WL 3466810, at *1–3; *In re Penthouse Exec. Club Comp. Litig.*, No 10-cv-1145 (NRB), 2010 WL 4340255, at *3 (S.D.N.Y. Oct. 27, 2010) (rejecting defendants' argument that "certification is improper because the issue of whether [defendant] properly classified dancers as independent contractors will require an 'individualized, fact intensive inquiry' into the nature of each dancer's relationship with [defendant]"). The "similarly situated" standard merely requires that potential opt-in plaintiffs resemble the named plaintiffs enough to suggest a common answer to the

---

[3] The independent contractor case that Gawker cites was a Rule 23 case, not a § 216(b) case. *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181 (S.D.N.Y. 2010). Gawker also misleadingly asserts that *Myers v. Hertz Corp.*, 624 F.3d 537, "affirmed the district court's finding" that a group of potential opt-in plaintiffs was too dissimilar to warrant conditional certification. Def. Opp. at 8 n.11. *Myers* affirmed the district court's denial of Rule 23 certification, and did not reach the magistrate judge's earlier denial of FLSA certification, which the district judge had declined to revisit under the law of the case doctrine. *See Myers v. Hertz Corp.*, No. 02-cv-4325, 2007 WL 2126264, at *2 (E.D.N.Y. July 24, 2007). These cases are inapplicable because "the 'similarly situated' standard for authorizing notice to potential opt-in plaintiffs in an FLSA collective action is 'considerably more liberal than class certification under Rule 23.'" *Grant*, 2014 WL 1918602, at *4 (quoting *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007)).

question of whether they were victims of the same alleged FLSA violation. As noted, this analysis requires at least some sense of the relevant FLSA standards, but as the following survey of Southern District case law shows, the resemblance between the named plaintiff and the opt-in class, as well as the nature of the alleged violation, are more important.

In several recent "intern misclassification" cases, judges in this district have considered whether to authorize notice to groups of interns based on the named plaintiffs' submissions. *See Fraticelli*, 2014 WL 1807105, at \*3 (discussing these decisions). In *Glatt v. Fox Searchlight Pictures*, 293 F.R.D. 516, Judge Pauley granted conditional certification where the plaintiffs offered "generalized proof that interns were victims of a common policy to replace workers with unpaid interns." *Id.* at 538. This proof included testimony that the defendant's departments requested interns "according to their needs," as well as an internal memorandum indicating that the company's intern program grew as its paid workforce shrank. *Id.* at 536, 538. In *O'Jeda v. Viacom, Inc.*, No. 13-cv-5658 (JMF), 2014 WL 1344604 (S.D.N.Y. Apr. 4, 2014), Judge Furman also granted certification, relying on evidence of a "centralized internship program" including a thirty-five page "internship guide," a memorandum mandating that interns complete an orientation program and work a minimum number of days, and centralized web pages describing the internship program. *Fraticelli*, 2014 WL 1807105, at \*3 (discussing *O'Jeda*). And in *Wang v. Hearst Corp.*, No. 12-cv-793 (HB), 2012 WL 2864524 (S.D.N.Y. July 12, 2012), Judge Baer granted certification based on evidence that interns uniformly performed "entry-level work with little supervision" and were "systematically used as substitutes for paid employees." *Id.* at \*2; *Fraticelli*, 2014 WL 1807105, at \*3. In *Fraticelli*, by contrast, Judge Furman determined that there was insufficient evidence of a centralized internship program: the plaintiffs' submissions showed "significant differences . . . among the interns in terms of the activities they performed,

8

the supervision, training, and benefits they received, the burdens they imposed on [the defendant], and the manner in which they were selected for their positions." 2014 WL 1807105, at *2 (citations omitted).

Judge Gardephe granted conditional certification in another recent case, *Grant v. Warner Music Group Corp.*, 2014 WL 1918602. In *Grant*, the plaintiffs alleged that they performed the same work as non-intern employees and received no pay or academic credit for that work. They also identified a common policy providing that each intern would receive a "special project" designed in part to help the defendant in "addressing a business need." *Id.* at *5 (emphasis omitted). Unlike in *Fraticelli*, the *Grant* plaintiffs "offered substantial evidence that Defendants' internship program was highly centralized, and that all interns were subject to the same policies, regardless of their location or the department in which they worked." *Id.* at *6. Additionally, Judge Gardephe rejected the defendants' argument that individual differences among the internships could defeat conditional certification; the essence of the plaintiffs' claims was that they performed the same tasks as non-exempt compensated employees, and mere differences between the interns with respect to their specific tasks and departments were not germane to whether the defendants treated them, in effect, as uncompensated employees. *See id.* at *7 ("The key inquiry is whether Defendants have a policy of not paying student interns who perform the same or similar tasks performed by non-exempt compensated employees.").

Taken together, these cases suggest that a plaintiff must supply evidence—enough to make a "modest factual showing"—suggesting centralized policies or decisions by the defendant that bear on factors such as interns' activities, supervision, training, selection, and the nature of the benefits to and burdens on the intern and the company. In other words, Plaintiffs must show that Gawker's policies or decisions likely allow a single answer to the question of whether the

interns were treated more like ordinary employees or, instead, students or trainees.  This inquiry

avoids, at this early stage, resolving the merits question of whether interns were treated *so much*

like regular non-exempt employees as to qualify for the FLSA's protections, but it helpfully

focuses on the presence (or absence) or similarities between interns that relate to that merits

question.  And notably, while the courts in both *Grant* and *Fraticelli* observed that the six-factor

DOL test was "at least relevant" to the scope of the *Walling* trainee exception, *Grant*, 2014 WL

1918602 at *5 (quoting *Fraticelli*, 2014 WL 1807105, at *2), they did not attend closely to the

standards governing the exception.  *O'Jeda* conducted *no* analysis of the trainee exception and

simply focused on whether there was enough proof that "members of the putative collective were

'victims of a common policy to replace paid workers with unpaid interns.'"  2014 WL 1344604,

at *1 (quoting *Glatt*, 293 F.R.D. at 537–38).  The Court finds these decisions persuasive and will

apply the same approach here.

   Upon reviewing the evidence presented by Plaintiffs, the Court concludes that they have

met their minimal burden.  As described below, Plaintiffs point to sufficient evidence suggesting

that they performed the kinds of tasks that compensated non-exempt employees ordinarily

perform, supporting the complaint's core allegation that Gawker "refus[es] to pay wages to its

workers by designating them as 'interns.'"  Am. Compl. ¶ 3.  Plaintiffs also point to enough

evidence of a centralized internship program to suggest that other Gawker interns, who may have

worked in different capacities than Plaintiffs, were nonetheless sufficiently similar from the key

standpoint of whether Gawker used them as stand-ins for compensated employees.  *See Grant*,

2014 WL 1918602, at *6 ("Defendants' contentions that interns work at locations throughout the

United States, and that 'disparate factual and employment settings' may exist among WMG and

its subsidiaries, do not vitiate the essence of Plaintiffs' claim, which is that all of Defendants'

student interns are 'victims of a common policy to replace paid workers with unpaid interns.'" (quoting *Glatt*, 293 F.R.D. at 538)).

First, Plaintiffs' declarations indicate that they performed work similar to that of paid Gawker employees: they abided by Gawker's general policies, used its internal communication systems, created content, researched and wrote stories, contributed to and moderated comments sections, and received primarily "on-the-job" training. *See* Hudson Decl. ¶¶ 11–28; Lu Decl. ¶¶ 13–26; Mark Decl. ¶¶ 11–28; Matthews Decl. ¶¶ 11–28. They indicate that "both paid employees and unpaid interns . . . performed the tasks [they] performed." *E.g.*, Matthews Decl. ¶ 20. Gawker is correct that averments made on "information and belief" are ordinarily given little weight in this context, *cf., e.g., Ikikhueme v. CulinArt, Inc.*, No. 13-cv-293 (JMF), 2013 WL 2395020, at *2 (S.D.N.Y. June 3, 2013), but it strikes the Court as plausible that researching and writing stories, in particular, is a task not performed exclusively by interns. Plaintiffs further suggest that they were supervised like ordinary employees, stating that they were expected to work independently and did not receive special training or instructions on how to should complete their assignments. *E.g.*, Matthews Decl. ¶¶ 24–25.

Plaintiffs' declarations are supported by additional evidence as well. Job postings describe interns' responsibilities, for example, as "[a]ssisting" in various editorial and technical capacities, "help[ing] us with our beloved communities," and "stressful labor under constant deadlines." Paparella Decl. Ex. 1. The last description is surely tongue-in-cheek, but the overall impression given by the postings is that Gawker was seeking interns to help run its websites, and

that the primary benefit to the interns was on-the-job training.[4]  Emails sent to interns, including

Lu, from supervisor Kaila Hale-Stern also frame interns' efforts moderating blog comments as an

important part of Gawker's operations.  Paparella Decl. Ex. 9.

Second, Plaintiffs have submitted enough evidence of a centralized internship program to

suggest that Gawker treated all of its interns similarly to the way it treated Plaintiffs.  The job

postings, except for one that relates only to Gawker.com, indicate that "Gawker Media" was

seeking interns, implying that applicants were evaluated according to common criteria and hired

to perform similar tasks across Gawker Media blogs.  Paparella Decl. Ex. 1; *cf. Grant*, 2014 WL

1918602, at *4 ("Plaintiffs' exhibits indicate that all students seeking an internship must

complete a standard application, and that internship applications flow through a common

website."); *Fraticelli*, 2014 WL 1807105, at *3 (describing evidence in *O'Jeda*, including

"centralized web pages that provided general descriptions of the program").  Moreover, to the

extent that the postings themselves shed inadequate light on interns' experiences,[5] Plaintiffs

themselves worked at four different blogs—io9.com (Hudson), Kotaku.com (Lu and Mark),

Lifehacker.com (Lu), and Gawker.TV (Matthews)—and the parallels between their accounts

suggest that interns at these blogs performed the same kinds of tasks (such as moderating

comments) and were subject to similar supervision.  Gawker's observation that Plaintiffs'

declarations are "cookie-cutter" therefore undercuts its position.  Def. Opp. at 12.  The

declarations also state, based on Plaintiffs' own knowledge and conversations that they had, that

---

[4] Gawker argues that these postings are irrelevant because they do not bear on interns' actual experiences, *see* Def. Br. at 13, but the Court finds them at least probative of how Gawker viewed its interns' work.  Gawker cites a portion of *Glatt* in which the court was addressing Rule 23, not FLSA certification.  293 F.R.D. at 536.

[5] *See supra* note 4.

other interns for the blogs where they worked had comparable experiences. *E.g.*, Matthews Decl. ¶¶ 30, 34. Emails from Hale-Stern were sent to groups of interns, referred to them as a team, and instructed them on moderating comments and the hours they were expected to work, among other things. Paparella Decl. Ex. 9. And, importantly from the perspective of whether all Gawker interns were subject to the same FLSA violation, the declarations state that neither Plaintiffs nor any interns they knew were paid. *E.g.*, Matthews Decl. ¶¶ 31–36.

In all, the Court concludes that this evidence is sufficient, at this stage, to suggest that—from the perspective of whether interns were essentially treated as unpaid employees—Plaintiffs' own experiences can be generalized to a group of potential opt-in plaintiffs that should receive notice of this lawsuit. *See Grant*, 2014 WL 1918602, at *7 ("[F]or purposes of the instant motion, it is not material whether, for example, [plaintiffs] performed somewhat different tasks during their internships and worked in different departments. The key inquiry is whether Defendants have a policy of not paying student interns who perform the same or similar tasks performed by non-exempt compensated employees. At this preliminary stage, Plaintiffs have proffered sufficient evidence to suggest that such a policy exists.").

The Court is not persuaded by Gawker's arguments to the contrary. Much of Gawker's opposition brief—for instance, its contention that Plaintiffs' accounts of their experiences as interns are "consistent with an internship in which they received greater benefit than Gawker did," Def. Opp. at 16—is devoted to resolution of the ultimate merits arguments about Plaintiffs' status as "employees," and is therefore not dispositive of the instant motion. It suffices to say that at this stage the factual showing that Plaintiffs have made to the contrary is sufficient.

Nor can Gawker defeat Plaintiffs' motion by controverting their factual presentation through its own declarations. *See* Dkt. Nos. 22–36; Def. Opp. at 20–23. As this Court has

recently noted, when a "plaintiff's allegations are sufficient on their face to support conditional certification, a defendant may not defeat the plaintiff's motion by presenting conflicting factual assertions." *Juarez v. 449 Rest., Inc.*, — F. Supp. 2d — , No. 13-cv-6977 (AJN), 2014 WL 3361765, at *7 (S.D.N.Y. July 2, 2014) (alteration in original) (quoting *Kim v. 511 E. 5th St., LLC*, 985 F. Supp. 2d 439, 446 (S.D.N.Y. 2013)) (internal quotation marks omitted). Gawker's surreply, which purports to identify deposition testimony showing "the deeply individual nature of the claims asserted in this case," Def. Surreply at 1, is premature for similar reasons. *See Amador v. Morgan Stanley & Co.*, No. 11-cv-4326 (RJS), 2013 WL 494020, at *8 (S.D.N.Y. Feb. 7, 2013).

The Court acknowledges that Gawker has highlighted certain factual differences between interns that arguably call into question the suitability of collective litigation. Most notably, as the job postings submitted by Plaintiffs suggest, some interns apparently received college credit for their internships; the DOL has indicated that academic credit can be an important factor in determining whether an unpaid internship is lawful. *See* Def. Opp. at 19 (citing DOL Opinion Letter, 1996 WL 1031777 (May 8, 1996)). Along similar lines, Gawker has submitted evidence that certain interns, including some who received college credit, were paid at least some compensation for their work. *See id.* at 19–20. Indeed, Plaintiffs themselves acknowledge that some interns were paid; the amended complaint refers to certain interns as "underpaid," as opposed to "unpaid." Am. Compl. ¶ 25. But given that Plaintiffs have met their minimal burden, the factual differences that Gawker identifies are appropriately addressed after discovery is completed, at which point Gawker will have an opportunity to seek to "decertify" the collective. *See O'Jeda*, 2014 WL 1344604, at *2 (concluding that factual differences should be addressed via decertification motion); *cf. Olmsted v. Residential Plus Mortg. Corp.*, Nos. 08-cv-142, 08-cv-

419, 2008 WL 5157973, at *3 (N.D. Ill. Dec. 9, 2008) ("Defendants' arguments that potential class members were paid based on differing compensation schemes and that those paid based on commission are exempt from the FLSA are more relevant to determining the ultimate scope, if any, of the collective action during step two.").

## IV.   Conclusion

For the reasons set forth above, Plaintiffs' motion for conditional certification and court-authorized notice under § 216(b) of the FLSA is GRANTED.

In its opposition brief, Gawker requests "an opportunity to meet and confer with Plaintiffs' counsel concerning the proposed notice." Def. Opp. at 24. That request is granted. Counsel for the parties are hereby directed to meet and confer regarding the content and dissemination of the notice and to submit a joint proposal to the Court by August 31, 2014. If the parties are unable to reach complete agreement, they should submit a joint letter by the same date. Their letter should (1) represent that the parties have met and conferred, (2) identify the precise issues on which disagreement remains, and (3) set forth each side's position on those issues. The parties should cite case law from courts in this Circuit that supports their arguments. After resolving any remaining issues, the Court will direct the parties to submit a joint proposed notice that reflects such resolution.

This resolves Docket No. 15.

SO ORDERED.

Dated:   August 15, 2014
          New York, New York

_____
ALISON J. NATHAN
United States District Judge

15