UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 9 2016

Aulistar Mark, *et al.*,

Plaintiffs,

–v–

Gawker Media LLC and Nick Denton,

Defendants.

13-cv-4347 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs Aulistar Mark and Andrew Hudson bring this employment action against Defendants Gawker Media LLC ("Gawker") and Nick Denton. Both Plaintiffs served as unpaid interns on Gawker's websites. They allege that Defendants' failure to compensate them for their time violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and New York Labor Law ("NYLL"), Art. 19 § 650 *et seq.* Plaintiffs have moved for partial summary judgment and certification of a class of unpaid former Gawker interns. Defendants have also moved for summary judgment. For the reasons set forth below, both of Plaintiffs' motions are denied, and Defendants' motion is granted.

## I.    Background

Gawker is a New York-based media company that operates a number of blogs dedicated to various topics in news, technology, and pop culture. These include Gawker.com, Kotaku, Lifehacker, Deadspin, io9, Gizmodo, and Jezebel. Defendants' Response to Plaintiffs' Statement Pursuant to Local Rule 56.1 ("Defs.' 56.1 Resp.") ¶¶ 1, 5. Until late 2012, Gawker employed interns. Pls.' Ex. 158 at 52–54. Gawker interns were generally not paid, though there were exceptions. Pls.' Ex. 160 at 45–46, 49–55. At the end of 2012, Gawker ceased offering internships, in part due to fear of labor law liability. Defs.' 56.1 Resp. ¶¶ 75–76; Sivitz S.J. Opp.

1

Decl. Ex. 5 at 66–67; Pls.' Ex. 22.  Gawker replaced its internships with paid editorial

fellowships.  Sivitz Decl. Ex. 5 at 66–67; Pls.' Exs. 22; 157 at 65–66; 172–74.

Aulistar Mark ("Mark") worked as an intern for Kotaku, Gawker's videogame blog, from

May 24, 2010, through August 20, 2010.  Plaintiffs' Rule 56.1 Statement in Response to

Defendants' Statement ("Pls.' 56.1 Resp.") ¶ 15.  Mark's work for Kotaku included assisting the

blog's editors and writers, taking photos and videos, editing images, researching, writing, and

editing posts and articles, conducting interviews, covering events, and monitoring comments on

articles.  Defs.'s 56.1 Resp. ¶¶ 24–30.  Mark spent approximately 20 hours per week in the

Kotaku offices during his internship.  *Id.* ¶ 33.  All told, Kotaku published 34 articles written by

Mark.  *Id.* ¶ 39.  At the time of his internship, Mark was pursuing a degree in journalism at the

New School.  Pls.' 56.1 Resp. ¶ 22.  Mark received academic credit for the internship.  Defs.'

56.1 Resp. ¶ 36.

Andrew Hudson ("Hudson") worked as an intern for io9, Gawker's science fiction and

technology blog, from June 10, 2008, through August 14, 2008.  *Id.* ¶¶ 45–46.  Hudson

researched, wrote, and edited posts and articles for io9.  *Id.* ¶¶ 51–52.  Hudson worked remotely

from Missouri, about 24 hours per week.  *Id.* ¶¶ 55, 59.  At the time of his internship, Hudson

was pursuing a degree in political science with a minor in creative writing (focused on

journalism) at Fordham College.  Pls.' 56.1 Resp. ¶ 29.  Hudson did not receive academic credit

for the internship.  *Id.* ¶ 33.  Hudson published two articles during his time at io9.  *Id.* ¶ 35.

Plaintiffs filed the complaint in this action on June 21, 2013.  In addition to their

individual claims, Plaintiffs sought to bring their FLSA claims as an opt-in collective action

under 29 U.S.C. § 216(b), and to certify their state labor law claims as a class action under

Federal Rule of Civil Procedure 23.  On August 15, 2014, the Court conditionally certified

Plaintiffs' FLSA collective.  Former Gawker intern Zachary Cianflone became an opt-in plaintiff

in December 2014, and sixteen more former interns opted in to the collective over the course of

April 2015.  Plaintiffs now move for class certification of their state labor law claims under Rule

23, as well as partial summary judgment on the issue of whether Mark and Hudson were

employees of Gawker under the FLSA and NYLL.  Defendants have moved for summary judgment on all of Plaintiffs' claims.

## II.    Legal Standard

Federal Rule of Civil Procedure 56 "allows a party to seek a judgment before trial on the grounds that all facts relevant to a claim(s) or defense(s) are undisputed and that those facts entitle the party to the judgment sought." *Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014).  The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When the Court considers a motion for summary judgment, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994).

The initial "burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Id.*  If the movant "demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).  However, "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); *see also Anderson*, 477 U.S. at 249–50 (summary judgment "may be granted" if the opposing evidence is "merely colorable" or "not significantly probative").

3

### III.   The FLSA Claims of All Plaintiffs Except Mark Are Time-Barred

Defendants ask the Court to grant summary judgment on the FLSA claims of all Plaintiffs because they are time-barred.  Plaintiffs respond that genuine issues of material fact exist about (1) whether at least some Plaintiffs have timely claims, and (2) whether the Court should equitably toll the FLSA's statute of limitations for any Plaintiffs who filed late.  Defendants do not argue that Mark's and Hudson's NYLL claims are time-barred under NYLL's six-year statute of limitations.  NYLL § 198(3).

#### A.  The FLSA Statute of Limitations

The statute of limitations is an affirmative defense, and a defendant invoking it has the burden of proof.  *United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013).  Lawsuits arising from a violation of the FLSA are subject to a two-year statute of limitations.  29 U.S.C. § 255(a).  The FLSA's two-year statute of limitations is extended to three years if the violation was "willful."  *Id.*  An employer's violation of the FLSA is willful if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by the statute.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Showing that an employer acted unreasonably or negligently in determining its legal obligations is insufficient.  *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014); *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009).  However, "[e]mployers may be found to have acted recklessly pursuant to the FLSA if they made neither a diligent review nor consulted with counsel regarding their overtime practices and classifications of employees."  *Trimmer v. Barnes & Noble, Inc.*, 31 F. Supp. 3d 618, 627 (S.D.N.Y. 2014) (brackets omitted).

The FLSA allows plaintiffs who file suit to proceed as a collective action "for and in behalf of . . . themselves and other employees similarly situated."  29 U.S.C. § 216(b).  Any employees wishing to join in a FLSA collective action filed by their colleagues "must affirmatively 'opt in' to be part of the class and to be bound by any judgment."  *Myers v. Hertz Corp.*, 624 F.3d 537, 542 (2d Cir. 2010).  For those who choose to opt in to a collective action

4

initiated by another plaintiff, the statute of limitations continues to run until written consent to join the collective is filed. 29 U.S.C. § 256(b); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006) ("Signed consents do not relate back to the original filing date of the complaint.").

Even if some or all plaintiffs filed after the FLSA's limitations period, the Court will still entertain their claims if it is appropriate to equitably toll the statute of limitations. *See, e.g.*, *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 449 (S.D.N.Y. 2011). Equitable tolling is "an extraordinary measure." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004). "When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has 'acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003). Relevant to this case, equitable tolling is appropriate "[w]here defendant is responsible for concealing the existence of plaintiff's cause of action." *Veltri*, 393 F.3d at 323. In such circumstances, "[t]he relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Id.* "The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

### B. A Genuine Issue of Material Fact Exists About Whether Defendants' Conduct Was Willful

Defendants argue that the Court must apply the two-year statute of limitations in this case. They claim that no reasonable jury could find their conduct to be willfully (meaning knowingly or recklessly) unlawful, because the law regarding the FLSA and unpaid internships was, and to some extent is, unsettled. However, the record in this case presents a genuine issue of material fact on the question of willfulness.

First, a reasonable jury could find that Defendants acted willfully by recklessly disregarding a substantial and unjustifiable risk that their internships violated the FLSA. Gabrielle Darbyshire, Gawker's former Chief Operating Officer, stated that she considered the question of whether Gawker needed to pay its interns to be "a gray area" where "the law is not clear." Pls.' Ex. 4 at 43. She acknowledged that that Gawker had not consulted with outside counsel on this issue, nor had she expressed a legal opinion on it. *Id.* at 42–44. Instead, she stated that Gawker set its internship policy "based on [its] business needs" due to the lack of clarity in the law. *Id.* at 43. Darbyshire's account may simply describe Defendant's reasonable response to legal uncertainty, or unreasonable behavior that rises only to the level of negligence. Drawing all inferences in Plaintiffs' favor, however, a reasonable jury could conclude that Defendants were aware of a substantial and unjustifiable risk that their internships could be contrary to the FLSA, and recklessly disregarded that risk by creating an internship policy guided only by their business needs.

Second, a reasonable jury could find that Defendants acted willfully because they continued to employ unpaid interns after becoming aware that they faced significant potential liability for doing so. The depositions of Defendant Nick Denton and Gawker executive Scott Kidder both indicate that Gawker replaced its interns with paid editorial fellows in 2012 in part as a result of perceived changes in the legal environment that made unpaid internships too risky. Pls.' Ex. E. at 141–42; Pls.' Ex. H at 54; Sivitz Decl. Ex. 5 at 66. However, the record does not establish how much time elapsed between when Defendants became aware that there was a significant risk of liability under the FLSA for their unpaid internships and when they stopped offering such internships. The record contains some evidence that Defendants were aware that the legal landscape on unpaid internships was evolving as early as 2010. *See* Pls.' Ex. HHH (email between Kidder and Darbyshire linking to an article on recently-promulgated Department of Labor regulations regarding unpaid interns). Drawing all plausible inferences in Plaintiffs' favor, a reasonable jury could find that Defendants made the determination that some or all of

6

their unpaid internships were legally risky as early as 2010, but continued them with reckless disregard for whether their conduct violated the FLSA until 2012.

For these reasons, there is a genuine dispute of material fact on the question of whether Defendants' conduct was willful, and the Court will not grant summary judgment on Defendants' statute of limitations defense on claims made within the three-year time period. But as discussed below, this category consists of only one Plaintiff's claims.

### C. Mark is the Only Plaintiff Who Filed Suit Within Three Years

The only Plaintiff in this case—named or opt-in—who filed within the three-year statute of limitations is Aulistar Mark. Mark completed his internship on August 20, 2010, and filed his complaint on June 21, 2013, two years and ten months later. Pls.' 56.1 Resp. ¶ 15. The other named Plaintiff, Andrew Hudson, also filed on June 21, 2013, but he completed his internship on August 14, 2008, almost five years earlier. *Id.* ¶ 10. His claim is untimely. All opt-in Plaintiffs filed outside of the three-year period. Fifteen opt-in Plaintiffs ended their internships in February 2012 or earlier, and joined the collective in April 2015—creating a time gap greater than three years. *Id.* ¶¶ 1–5, 7–9, 11–14, 17–19. There is no genuine issue of material fact about whether these opt-in Plaintiffs filed their FLSA claims in a timely fashion. They plainly did not. Plaintiffs defend the timeliness of the remaining two opt-in Plaintiffs, Elizabeth Nadybal ("Nadybal"), one of the last Plaintiffs to join the collective in April 2015, and Zachary Cianflone ("Cianflone"), who joined the collective on December 15, 2014. For the reasons below, however, Plaintiffs' arguments are unsuccessful.

As to Nadybal, no reasonable jury could find that her claim is within the statute of limitations. The parties agree that Nadybal's internship began in July 2010. *Id.* ¶ 16. Whether Nadybal's claim is timely depends on when Nadybal completed her internship. Nadybal provides no testimony or other evidence of when her internship ended. The record establishes that Gawker had a policy—in force around the time Nadybal began working at Gawker—that internships were to last no longer than six months at the most. Pls.' Ex 47; see also Pls.' Ex. 25.

In order for Nadybal's consent to join the collective action to be timely even under the three-year statute of limitations, she would have had to stay on until April 2012—meaning that she would have been an intern for twenty-one months, more than three times as long as Gawker's policy permitted, and by far the longest internship of any Plaintiff. *See* Pls.' 56.1 Resp. ¶¶ 1–19.  This evidence is sufficient to satisfy Defendants' initial burden to demonstrate that no reasonable juror could find that Nadybal was still an intern in April 2012. *See Gallo*, 22 F.3d 1223. Plaintiffs must now "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" on this point. *Eli Lilly*, 654 F.3d at 358.  Plaintiffs' only response is to note that Defendants have presented no specific evidence identifying the end of Nadybal's internship. Pls.' 56.1 Resp. ¶ 16.  That is insufficient to resist summary judgment.

Cianflone's opt-in consent was filed on December 15, 2014.  The parties agree that Cianflone's internship began in October 2011. *Id.* ¶ 6.  So in order for Cianflone's consent to join the collective action to be timely, he would had to have stayed on at Gawker until at least December 15, 2011.  But Defendants argue that Cianflone's internship ended no later than December 7, 2011, and point to an email sent that day in which Cianflone appears to acknowledge the termination of his internship. Peterson Decl. Ex. 9.  The email is sufficient to satisfy Defendants' burden of production.  Plaintiffs respond that Cianflone intended to return to Gawker, because he wrote in the December 7, 2011, email that "[I] really do hope that [I] can come back and prove to you guys that [I] do give a shit.  I'll be in touch." *Id.*  However, this statement does not allow the inference that Cianflone would continue on in his current internship, but rather that he was no longer at Gawker, yet hoped to return at some point in the future.  Plaintiffs also note that Cianflone was evidently still receiving some email correspondence from Gawker, because during discovery he turned over an email sent to all Gizmodo personnel dated February 13, 2012. Pls.' Ex. KKK.  However, the fact that Cianflone was in possession of the email provides minimal support for the claim that Cianflone was still an intern at Gawker, since he may simply not yet have been removed from the Gizmodo email list. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient" to prevent summary judgment. *Anderson*, 477 U.S. at 252. Instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* Plaintiffs have not provided such evidence, and accordingly there is no genuine issue of material fact on the timeliness of Cianflone's opt-in consent. His too is untimely.

### D.   Equitable Tolling is Not Available to the Time-Barred Plaintiffs

In the final issue relating to the FLSA statute of limitations, Defendants seek summary judgment that Plaintiffs are not entitled to equitable tolling. As noted above, equitable tolling is appropriate if the plaintiff "(1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass*, 333 F.3d at 80–81 (internal quotation marks omitted). Plaintiffs put forward three rationales for equitable tolling.

#### 1.   Failure to Post Required Notice

Plaintiffs first argue that they are entitled to equitable tolling because Defendants failed to post a notice informing employees of their FLSA rights in Gawker's New York office. Employers subject to the minimum wage and overtime provisions of the statute are required to "post and keep posted a notice explaining the Act . . . in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy." 29 C.F.R. § 516.4. There is a split among courts in this district over whether equitable tolling can be justified by a failure to post a FLSA notice in the absence of deception or similar behavior by the employer. *See Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 76, 88 n.9 (E.D.N.Y. 2012) (identifying split); *compare, e.g., Jin M. Cao v. Wu Liang Ye Lexington Rest., Inc.*, No. 08 CIV. 3725 DC, 2010 WL 4159391, at *1 (S.D.N.Y. Sept. 30, 2010) (deception required) *with, e.g., Upadhyay v. Sethi*, 848 F. Supp. 2d 439, 445–46 (S.D.N.Y. 2012) (deception not required). Even for those courts not requiring evidence of deception, however, failure to post a FLSA notice "is not by itself sufficient to warrant equitable tolling; plaintiff must also show

that she had not received notice of her rights through any other avenue." *Upadhyay*, 848 F. Supp. 2d at 445; *see also, e.g.*, *Saunders v. City of New York*, 594 F. Supp. 2d 346, 363–64 (S.D.N.Y. 2008) ("If plaintiffs knew of the rights outlined on the required notice despite the failure to post, then equitable tolling is unavailable."); *Maldonado v. La Nueva Rampa, Inc.*, No. 10 CIV. 8195 LLS JLC, 2012 WL 1669341, at *4 (S.D.N.Y. May 14, 2012), *report and recommendation adopted*, Dkt. No. 20 (S.D.N.Y. Aug. 9, 2012) (failure to provide notice was insufficient for tolling where "[p]laintiffs have not pled or otherwise alleged that they were unaware of their rights."). This is simply a variation on the requirement that a plaintiff seeking equitable tolling demonstrate that she acted with "reasonable diligence." *See Zerilli-Edelglass*, 333 F.3d at 80.

Plaintiffs' equitable tolling argument suffers from two weaknesses. First, there is significant evidence in the record that Defendants *did* post a FLSA notice at the New York office. Two employees who work there full-time stated that there was and is a FLSA notice in the office kitchen. Pls.' Ex. H at 130; Pls.' Ex. L at 63. The evidence to the contrary is the testimony of four employees who do not work at the New York office and visit only rarely. *See* Pls.' Ex. A at 77, 85; Pls.' Ex. B. at 95; Pls.' Ex. C at 60, 78; Pls.' Ex. J at 18, 127. None of these employees stated that the FLSA notice was absent, merely that they had not observed, or did not recall it. *See, e.g.*, Pls.' Ex. B. at 95 (witness asked whether he had seen the notice replied "Not that I know of. But I also don't spend very much time in the office because I am remote.").

Second, even assuming that a reasonable jury could find on the basis of this evidence that no FLSA notice was posted, Plaintiffs would still be unable to justify equitable tolling. The record regarding the opt-in Plaintiffs is inadequate because it contains no evidence (or even allegations) that they did not know their FLSA rights—and by extension, that they failed to timely file despite reasonable diligence. *See Upadhyay*, 848 F. Supp. 2d at 445. In the absence of evidence to the contrary, the evidentiary burden to establish a genuine issue of material fact that the opt-in Plaintiffs did not know their rights is not a high one. But it cannot be met by an

empty record. An employer's failures to put up required FLSA notices are "an important factor in determining the propriety of equitable tolling, [but] without more they do not constitute the 'rare and exceptional' circumstances that warrant equitable tolling." *Maldonado*, 2012 WL 1669341, at *4 (brackets and internal quotation marks omitted). Plaintiffs have not created a record from which a reasonable jury could rule in their favor on this point.

### 2. Invalid Release of Claims

Plaintiffs' second argument for equitable tolling is that Defendants required interns to sign a misleading release of all their claims against Gawker. The release was necessarily ineffective with respect to the claims in this case, because employees cannot waive their right to be paid the minimum wage under either the FLSA or NYLL. *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981); NYLL § 663(1). Defendants respond that an invalid release is not a basis for equitable tolling. Their authority for this proposition is *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 384 (3d Cir. 2007), which held that although an invalid release may mislead, it cannot cause a late filing for equitable tolling purposes because "everyone[] has access to the law." The Court is unpersuaded by this reasoning. FLSA litigation frequently concerns "individuals at the bottom of the economic ladder, often immigrants with few skills and limited education. The ability of most to learn of their legal rights under the complex web of labor and social legislation that governs the modern workplace is not great." *Ramirez v. CSJ & Co.*, No. 06 CIV. 13677 (LAK), 2007 WL 1040363, at *3 (S.D.N.Y. Apr. 3, 2007). Furthermore, even those with access to the law will not know to exercise it if they believe they have signed away their claims. When an employee is made to sign an invalid release that purports to give up claims against his or her employer, there can be a triable issue of fact regarding whether equitable tolling is appropriate on the grounds that defendant concealed his cause of action. *See Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 391 (5th Cir. 2002) (estopping statute of limitations defense where invalid blanket release reasonably misled plaintiff into untimely filing of claim); *Mueller v. CBS, Inc.*, 201 F.R.D. 425, 429–30 (W.D. Pa. 2001).

Turning to the record, named Plaintiff Mark signed an invalid release entitled "Intern Policy and Acknowledgement" on May 26, 2010.  Pls.' 56.1 Resp. ¶ 20; Kidder Decl. Ex. 3.  Plaintiffs concede that there is no evidence that Hudson signed such a release.  Defs.' 56.1 Resp. ¶ 73.  As to the opt-in Plaintiffs, evidence in the record suggests that at least in mid-2010, it was Gawker's standard policy to have interns sign the "Intern Policy and Acknowledgement" release.  *See* Pls.' Ex. 100 (email attaching release form for signature to group of new interns); Pls.' Ex. 4 at 51–52 (stating that an intern policy document was given to Gawker interns as they began work).  Even though Plaintiffs do not provide specific evidence that any Plaintiff besides Mark signed the release, a reasonable jury could find based on this evidence that other opt-in Plaintiffs signed the release.

However, as with the FLSA posted notice argument above, raising a genuine issue of material fact regarding Defendants' actions only covers part of the requirements for equitable tolling.  Plaintiffs must also demonstrate that they acted with reasonable diligence, but were thwarted by Defendants' actions.  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014).  In this context, Plaintiffs must show that despite being reasonably diligent they were actually misled by the release into believing that their claims were lost.  *See Min Fu v. Hunan of Morris Food Inc.*, No. CIV. 12-05871 KM, 2013 WL 5970167, at *8 (D.N.J. Nov. 6, 2013).  As previously, raising a triable issue of fact on this point is not a heavy burden, but an empty record is not sufficient.  Plaintiffs have provided no information at all about the opt-in Plaintiffs from which a reasonable jury could find (1) that they were reasonably diligent, and (2) that Defendants' actions were responsible for their failure to timely file.

Furthermore, equitable tolling based on the release would not help the opt-in Plaintiffs remain in the collective action.  The release also contains a waiver of class and collective action claims.  This waiver is effective.  In *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 (2d Cir. 2013), the Second Circuit upheld a waiver of the right to participate in a FLSA collective action, on the grounds that the FLSA contains no "contrary congressional command" requiring courts to reject such waivers, and that the plaintiff could vindicate his FLSA rights in an

12

individual suit.  Plaintiffs argue that *Sutherland* does not apply here because *Sutherland* involved a collective action waiver in the context of arbitration.  Plaintiffs cite a Sixth Circuit case, *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 591–92 (6th Cir. 2013), which held that collective action waivers are *only* valid in arbitration, and not otherwise.  However, *Killion*'s holding is premised on the Sixth Circuit's determination that the FLSA contains a federal policy against allowing waivers of the right to proceed collectively.  *Id.*  Because the Second Circuit in *Sutherland* determined that the FLSA contains no such policy, 726 F.3d at 296–97 & n.6, the Court cannot follow *Killion*.  Furthermore, nothing in *Sutherland*'s reasoning relies on the fact that the collective action waiver in that case was in the arbitration context.  Accordingly, even if a jury could and did find equitable tolling appropriate for an opt-in Plaintiff based on a release, that Plaintiff would have to be dismissed from the collective action as a result of the class and collective action waiver, and would need to file suit individually.

### 3.  Failure to Maintain Records on Former Interns

Plaintiffs' final argument for equitable tolling is that Defendants failed to keep adequate records of their interns and to timely produce what information they had.  Plaintiffs claim that Defendants therefore were responsible for untimely filing by the opt-in Plaintiffs.  This argument is meritless.

As to any opt-in Plaintiffs that Plaintiffs identified without Defendants' assistance, Plaintiffs provide no authority or evidence for the proposition that Gawker had any obligation to maintain complete records on its former interns, or that its failure to do so is an "extraordinary" circumstance justifying equitable tolling.  Furthermore, the Court approved widespread notice to potential collective members through stand-alone websites and social media so that Plaintiffs did not need to rely on Defendants' records.  Plaintiffs do not point to any opt-in Plaintiffs who would have issued consents more quickly had Defendants been able to identify them.

As to those opt-in Plaintiffs identified by Defendants, Plaintiffs fail to provide authority, evidence, or even specific allegations to support the claim that Defendants took an unreasonably

long time in responding to Plaintiffs' discovery requests. Plaintiffs previously requested equitable tolling of the statute of limitations during the pendency of their motion for conditional certification of the collective action. The Court denied this request on the grounds that the delay was not "extraordinary," as required by the standard for equitable tolling, but was rather the normal passing of time during litigation. Dkt. No. 80 at 4. The same is true here, and Plaintiffs have failed to raise any genuine issue of material fact that would, if resolved in their favor, permit the Court to determine otherwise.

The Court concludes that the federal claims of all Plaintiffs except Mark are time-barred, and grants summary judgment to Defendants on those claims.

## IV.   Whether Mark and Hudson Were Employees of Gawker

Having dismissed the federal claims of Hudson and the opt-in Plaintiffs as untimely, the Court now turns to the substance of Mark's claims under the FLSA and NYLL, and Hudson's remaining claim under NYLL. Plaintiffs and Defendants each move for summary judgment on the issue of whether Mark and Hudson were employees as that term is defined in the FLSA and NYLL.

The FLSA (subject to exceptions not relevant here) requires employers to pay employees a specified minimum wage. 29 U.S.C. §§ 206–07. NYLL has the same requirement, but sets a higher minimum wage. *See* NYLL § 652. These protections cannot be waived. *Barrentine*, 450 U.S. at 740; NYLL § 663(1). The FLSA defines "employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), and NYLL defines an "employee" as "any individual employed or permitted to work by an employer." NYLL § 651; *see also* 12 N.Y.C.R.R. § 142-2.14(a) (defining "employee" as "any individual employed, suffered or permitted to work by an employer"). Because these definitions are similar, the Court will "construe the NYLL definition as the same in substance as the definition in the FLSA." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2015).

## A. The Primary Beneficiary Test

In its recent decision in *Glatt v. Fox Searchlight Pictures, Inc.*, the Second Circuit adopted a "primary beneficiary" test for determining whether an unpaid intern is an employee within the meaning of the FLSA and NYLL.  811 F.3d at 536.  "Under this standard, an employment relationship is not created when the tangible and intangible benefits provided to the intern are greater than the intern's contribution to the employer's operation." *Id.* at 535. Applying this test requires "weighing and balancing" the totality of the circumstances in light of all relevant evidence. *Id.* at 537.

The court conducts this balancing test in view of the nature of unpaid internships.  Under *Glatt*, "[t]he purpose of a bona-fide internship is to integrate classroom learning with practical skill development in a real-world setting," and an intern in a bona-fide internship is not an employee. *Id.*  The primary beneficiary analysis "focuses on what the intern receives in exchange for his work." *Id.* at 536.  An intern "enters into the relationship [with her employer] with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment (though such benefits may be a product of experience on the job)." *Id.*  Thus, an intern can be the primary beneficiary of an internship even if some or all of the benefits he receives stem from work experience rather than formal training.

The purpose of employing a balancing test is to give courts "the flexibility to examine the economic reality as it exists between the intern and the employer." *Id.*  As the Eleventh Circuit explained in adopting the *Glatt* test, "there is nothing inherently wrong with an employer's benefiting from an internship that also plainly benefits the interns." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1211 (11th Cir. 2015).  Insofar as the relationship at issue has the qualities of a bona fide internship, providing educational or vocational benefits in a real-world setting, the intern can be the primary beneficiary of the relationship even if her activities provide direct benefit to the employer.  However, the court must "recognize the potential for some employers to maximize their benefits at the unfair expense and abuse of student interns." *Id.*  If the "economic reality" of the relationship is that the intern is providing free labor to the

15

employer without receiving significant educational or vocational benefits in return, then the outward trappings of an internship will not prevent the court from determining that the intern is an employee.

The Second Circuit has provided a non-exhaustive list of factors for courts to consider when evaluating internships.

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Glatt*, 811 F.3d at 536–37. "No one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee entitled to the minimum wage." *Id.* at 537. Where appropriate, the court may "consider evidence about an internship program as a whole rather than the experience of a specific intern." *Id.* In evaluating the "economic reality" of a work relationship under the totality of the circumstances, "[t]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or [interns]—is a question of law." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988).

Plaintiffs bear the burden of demonstrating that they were employees entitled to the protections of the FLSA rather than bona fide interns. *Acosta v. Hall of Fame Music Stores, Inc.*, No. 10-CV-5139 SLT LB, 2015 WL 1003550, at *3 n.1 (E.D.N.Y. Mar. 5, 2015) (adopting report and recommendation).

### B. Mark Was the Primary Beneficiary Of His Internship

The Court begins its analysis of Mark's internship by considering the factors suggested by the Second Circuit. The Court then considers whether, under the totality of the circumstances, Mark was the primary beneficiary of his internship. For the reasons discussed below, the Court concludes based on the undisputed facts that Mark was a bona fide intern rather than an employee.

#### 1. The Extent to Which the Intern and the Employer Clearly Understand That There is No Expectation of Compensation

Plaintiffs concede that Defendants and Mark both understood that Mark had no expectation of compensation. Pls.' S.J. Br. at 23. This factor favors Defendants, but it is of limited importance. If Defendants made some implicit or explicit representation to Mark that he would be paid, that would suggest that Mark was an employee. The fact that Mark agreed to work for free does not provide significant affirmative support to Defendants' decision not to pay him, however, because the right to earn minimum wage under the FLSA cannot be waived.

#### 2. The Extent to Which the Internship Provides Training That Would Be Similar to That Which Would Be Given in an Educational Environment, Including the Clinical and Other Hands-On Training Provided by Educational Institutions

Plaintiffs argue that Gawker did not provide Mark with appropriate training, because he "received absolutely no classroom, or similar training," and instead got only "the same on-the-job training that Gawker provided to its paid employees, which in no way resembled" training in an educational environment. *Id.* at 21. Not so. Plaintiffs take too narrow a view of this factor, which includes the equivalent of "clinical and other hands-on training." *Glatt*, 811 F.3d at 537.

And as noted above, the educational or vocational benefits received by an intern can be "a product of experience on the job." *Id.* at 536.

Once the nature of this factor is correctly understood, there is no genuine issue of material fact that Mark received significant training while at Kotaku. Stephen Totilo ("Totilo"), Mark's editor at Kotaku, provided mentorship and opportunities to learn journalism skills that were not offered to full-time employees who were expected to already possess an advanced journalism skillset. Sivitz Decl. Ex. 1 ("Totilo Dep.") at 103–05. One particular concern of Totilo's was that Mark get the opportunity to write and publish a larger-scale reported story. *Id.* at 30. Totilo worked with Mark over many weeks and drafts, "tweaking things, encouraging him to do more reporting and really put a lot of attention into it so he could feel really proud of the piece by the time it was published." *Id.* The resulting story was published on Kotaku under Mark's byline shortly before the end of his internship. Pls.' Ex. 180. Full-time Kotaku employees are expected to produce comparable pieces in timeframes as short as one to two days. Pls.' 56.1 Resp. ¶ 27.

Mark confirms this picture of his work with Totilo, explaining that Totilo would read his articles and give him criticism and comments, after which Mark would revise the pieces for publication on Kotaku. Sivitz Decl. Ex. 2 ("Mark Dep.") at 76. Mark stated that his relationship with Totilo was "similar" to his relationship with his editor at journalism school, and that Totilo's comments were "about as helpful." *Id.* at 76–77. In other words, the training and mentorship that Mark received was the same sort of hands-on instruction he received from his educational institution. Nothing in the record contradicts this evidence. In a declaration, Mark states that during his internship he was expected to work independently, that the editors he worked for "did not take longer to explain assignments to me than I would expect they would take to explain assignments to a paid employee," and that his training "was primarily gained by doing the work on-the-job." Pls.' Ex. 164 at 5. However, none of these statements are incompatible with the account of vocational training and mentorship in Totilo's and Mark's

18

depositions. This factor points in favor of finding that Mark was not an employee, and there is no genuine issue of material fact that could influence this determination.

### 3. The Extent to Which the Internship is Tied to the Intern's Formal Education Program by Integrated Coursework or the Receipt of Academic Credit

It is undisputed that both parts of this factor were met. Mark received academic credit for his internship. Pls.' 56.1 Resp. ¶ 23. Furthermore, the New School required that Mark take an internship class to accompany his internship, that he write several papers about the internship for his class, that he prepare and submit a "learning agreement" regarding the internship on a form prescribed by the school, and that Totilo submit evaluations of Mark's work to the school. *Id.* ¶ 24. Plaintiffs point out that Gawker did not *require* these things, but that is irrelevant. Gawker may have acted at its own risk by not insisting on academic integration of the internship, but in Mark's case it did occur. Of course, if Mark had spent his whole internship fetching coffee, then the provision of academic credit and coursework would simply add insult to injury—he would have been learning nothing and paying the New School for the privilege. But that was not the case here. Mark published 34 posts on Kotaku, including the substantial reported piece described above, and received mentorship and training from Totilo. A reasonable jury would be compelled to find that Mark's internship was closely integrated with his journalism school curriculum, and this factor points in Defendants' favor.

### 4. The Extent to Which the Internship Accommodates the Intern's Academic Commitments by Corresponding to the Academic Calendar

The parties and the record do not dwell on the relationship between Mark's internship and the academic calendar, but insofar as this factor is relevant it favors the Defendants. Mark's internship class at the New School set the minimum number of hours worked by Mark, and required him to submit weekly time sheets signed by his supervisor. Pls.' 56.1 Resp. ¶ 24. There is no genuine issue of material fact that insofar as Mark's academic commitments imposed requirements on the internship, they were accommodated.

### 5.   The Extent to Which the Internship's Duration is Limited to the Period in Which the Internship Provides the Intern with Beneficial Learning

In applying this factor, the Court must "keep in mind that designing an internship is not an exact science," and that the length of an internship cannot be expected to "always match up perfectly with the skills to be taught and the experience to be gained through the program." *Schumann*, 803 F.3d at 1213. In order to provide significant weight in favor of the plaintiff, the length of the internship must be "grossly excessive in comparison to the period of beneficial learning." *Id.* at 1214.

The record demonstrates that Mark's internship did not extend beyond the point where he was learning new skills and having important new experiences, and Plaintiffs point to no evidence that would create a genuine issue of material fact on this factor. Mark's internship was short, lasting only three months. Pls.' 56.1 Resp. ¶ 15. Insofar as any beneficial learning occurred (and, as indicated above, the record requires the conclusion that it did), no reasonable jury could conclude that Mark could learn everything Kotaku and Totilo had to teach about writing and reporting in significantly less than three months. Furthermore, Mark's larger-scale reported piece, a capstone of his internship, was published just two weeks before the conclusion of his internship. *See id.*; Pls.' Ex. 180. There is no genuine issue of material fact regarding this factor, and it favors Defendants.

### 6.   The Extent to Which the Intern's Work Complements, Rather Than Displaces, the Work of Paid Employees While Providing Significant Educational Benefits to the Intern

The FLSA does not permit employers to simply replace employees with student workers and call them "interns" to avoid paying minimum wage. Under this factor, the appropriate role of an intern is generally that of one whose work complements the labor of paid employees— though that complementary labor must be educational rather than mere scut work that the paid employees would rather avoid. However, there is no reason why "complementary" work cannot benefit the employer, or be work that paid employees would need to do (in one form or another) in an intern's absence.

Plaintiffs argue that Mark's work was of the sort that displaced the work of paid employees because Mark performed the same or similar duties performed by the employees who supervised him, reduced their workloads, and cut down on costs that Gawker would otherwise have had to pay others to perform. Pls.' S.J. Br. at 23. Mark's work for Kotaku included researching, writing, and editing posts and articles, conducting interviews, taking and editing photos and videos, covering events, and moderating the comments on articles. Defs.' 56.1 Resp. ¶¶ 23–30. Totilo acknowledged that some work conducted by interns at Kotaku (*e.g.*, research) would have been done by paid staff members in the interns' absence, while other work (*e.g.*, copy-editing), would have been left undone. Totilo Dep. at 79–80. Insofar as Mark worked as an assistant to other Kotaku writers, that work was complementary. However, a significant portion of Mark's workload was to write and publish posts on Kotaku. *See* Mark Dep. at 92. Like all Gawker sites, Kotaku's revenue comes from advertising, Defs.' 56.1 Resp. ¶¶ 8–9, and the primary job of its writer/reporter employees is to write posts for the site, *see* Totilo Dep. at 31. Mark's work was potentially of a kind that displaced the labor of paid employees.

In addition to Mark's personal experiences, a jury in this case could also consider evidence about the Kotaku internship program generally. *See Glatt*, 811 F.3d at 537. In one email (sent after Mark's internship concluded), Totilo states that "[t]he first small steps toward team expansion—and therefore an alleviation of posting workload—will occur this week as we start a pair of new interns." Pls.' Ex. 198. This indicates that Kotaku interns could do some work that would otherwise be done by paid employees. However, the remainder of the email indicates that the interns' role is largely complementary to paid writers ("the standard intern mix of research and support as well as a small bit of writing"), and that Kotaku was "full steam ahead on new hires" for paid full- and part-time employees. *Id.* Another email from Totilo (not regarding Mark) describes a discrepancy in skillset between interns and professional writers: "there's a huge gulf between being able to field a few stories we toss at you and being able to be one of two people on the site for a shift." Pls.' Ex. 192.

Drawing all plausible inferences in Plaintiffs' favor, a reasonable jury could find that Mark did the same kind of work as a paid Kotaku writer, at least part of the time. It could therefore find that his work displaced, rather than complemented, the writers' work. A reasonable jury could also find that Kotaku interns performed complementary tasks that paid employees would otherwise have had to perform, thus freeing up their time. However, Plaintiffs do not point to any evidence that would permit a reasonable jury to find that Defendants in fact used interns to displace paid employees, that interns had skills comparable to those expected of Kotaku employees, or that in the absence of interns, Defendants would have hired more paid employees. On that last point, in fact, the record contains contrary evidence: after Gawker switched from interns to paid fellows, Kotaku stopped using both. Totilo Dep. at 80. Overall, this factor favors Plaintiffs, but only mildly.

### 7. The Extent to Which the Intern and the Employer Understand That the Internship is Conducted Without Entitlement to a Paid Job at the Conclusion of the Internship

Plaintiffs concede that Mark had no entitlement to a paid job at Kotaku after his internship, and that this factor favors Defendants. Pls.' S.J. Br. at 23. However, like the first factor, this does not weigh strongly in Defendants' favor. If Mark reasonably expected that he was entitled to a paid job at the end of the internship, then that would indicate that he was a beginner employee, rather than a bona fide intern. The lack of such an expectation, however, does not weigh in favor of a determination that he was a bona fide intern.

### 8. Mark Was the Primary Beneficiary of His Internship Under the Totality of the Circumstances

Having evaluated the *Glatt* factors, the Court now turns to the question of whether Mark was the primary beneficiary of his internship. As noted above, in evaluating the "economic reality" of a work relationship under the totality of the circumstances, "[t]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those

facts—whether workers are employees or [interns]—is a question of law." *Superior Care*, 840 F.2d at 1058–59.

Under the totality of the circumstances, and resolving all ambiguities and drawing all inferences in favor of Plaintiffs, Mark was properly classified as an unpaid intern rather than an employee. Mark's internship integrated classroom learning with practical skill development in a real-world setting. A journalism student, Mark received the opportunity to practice journalism in a workplace context. He did so under the oversight of a mentor who edited his work (in a similar role to his editor at journalism school), provided him opportunities to develop skills, and helped him produce a full reported piece for his portfolio. And Mark's practical experiences at Kotaku were connected directly to his course of study via his internship class, where Mark wrote papers, reflected on his experience, and was held accountable for his time. *Glatt* instructs the Court that the primary beneficiary test "focuses on what the intern receives in exchange for his work." 811 F.3d at 536. Here, there is no genuine dispute of material fact that Mark received significant "educational or vocational benefits," a conclusion supported by all of the *Glatt* factors concerning Mark's education. *Id.*

The Court turns next to the employer's side of the ledger. There is some evidence that interns were a net detriment to Defendants: Totilo stated at his deposition that he eventually concluded that the cost of managing interns in time and effort outweighed the benefits, Totilo Dep. at 79, and shortly after the internships changed over to editorial fellowships, stopped hiring people to fill that role, *id.* at 80. Despite this, a reasonable jury could conclude that Defendants received a benefit from Mark's reporting, which garnered thousands of page views with attendant advertising revenue. Defs.' 56.1 Resp. ¶ 40. Plaintiffs also provide sufficient evidence for a reasonable jury to conclude that Defendants benefitted from the internship program because it enabled them to identify potential future hires. Pls.' 56.1 ¶ 111; Pls.' Ex. 161 at 43.

Assuming, as the Court must, that Plaintiffs will prevail on all genuinely disputed issues of fact, the Court is now confronted with the question of "how to discern the primary beneficiary in a relationship where both the intern and the employer may obtain significant benefits."

*Schumann*, 803 F.3d at 1211.  In adopting *Glatt*, the Eleventh Circuit stated that "the best way to do this is to focus on the benefits to the student while still considering whether the manner in which the employer implements the internship program takes unfair advantage of or is otherwise abusive towards the student."  *Id.*  The Court is persuaded by this framing of the inquiry, which follows naturally from *Glatt*'s emphasis on "what the intern receives in exchange for his work," 811 F.3d at 536, and its intention that "bona fide" internships fall outside the scope of the FLSA, *id.* at 537.

The benefits that Gawker received from Mark's work did not represent the company taking unfair advantage of or acting abusively towards an intern.  The fact that Mark's work could be published (after editing) on Kotaku benefitted Defendants, but it benefitted Mark as a journalism student at least as much.  Producing content for Kotaku gave Mark the opportunity to practice the job he was training for, and it also gave him published articles for his portfolio.  If Mark had not been permitted to produce posts and articles and had been confined only to acting as an assistant to reporters, the internship would have been much less valuable to him.  And, as discussed above, there is no evidence that Mark's presence could have or did enable Defendants to displace paid workers.

Nor was it unfair or abusive for Defendants to look to their interns as a potential pool of future employees.  *Walling v. Portland Terminal Co.*, 330 U.S. 148, 153 (1947), the case that established the exception to the FLSA that forms the basis for unpaid internships, concerned unpaid railroad trainees.  The railroad offered the training program because its graduates formed a pool of qualified individuals from which the railroad could hire.  *Id.* at 150.  The Supreme Court treated this benefit as too attenuated to be relevant, and focused instead on whether the trainees "expedite the company business."  *Id.* at 150.  *Glatt* retains *Walling*'s emphasis on the direct benefits of an intern's labor, asking whether "the tangible and intangible benefits provided to the intern are greater than *the intern's contribution to the employer's operation.*"  811 F.2d at 536 (emphasis added).  This Court therefore accords relatively minor significance to any benefit Defendants received from being able to evaluate Mark as a potential future employee.

The Court has considered the totality of the circumstances and the economic reality of the relationship between Mark and Defendants. Mark's time with Kotaku was a bona fide internship in which Mark traded his labor for significant vocational and educational benefits, and these benefits outweighed those received by Defendants in the form of Mark's work and the ability to evaluate him for future employment. There are no genuine issues of *material* fact—that is, issues that could change the Court's calculus if resolved in favor of Mark at trial. *See City of Waterbury*, 542 F.3d at 35. The Court concludes that Mark was the primary beneficiary of his internship, and grants summary judgment to Defendants on his FLSA and NYLL claims. Those claims are dismissed.

### C. The Court Declines to Exercise Supplemental Jurisdiction Over Hudson's NYLL Claim

Having granted summary judgment on the statute of limitations and determined that Hudson's FLSA claim is untimely, there is no longer an independent basis for federal jurisdiction over his state labor law claim. In fact, there are no longer any federal law claims remaining in this litigation, as the opt-in Plaintiffs' FLSA claims are all time-barred, and the Court has granted summary judgment against Mark on the merits. "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998). The Court has discretion to retain jurisdiction over state law claims when doing so would serve "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

The Court has considered these values and sees no justification for exercising its discretion in this instance. "Although the Court has the discretion to exercise supplemental jurisdiction over [Hudson's] remaining New York Labor Law claim, it declines to do so as resolution of the state claim may require the determination of additional factual and legal issues." *Johnson v. Ultravolt, Inc.*, No. CIV.A. 13-3518, 2015 WL 541519, at *7 (E.D.N.Y. Feb. 10, 2015) (footnote omitted). Discovery has been completed on Hudson's claim, and would not need to be repeated if this action were brought in state court. *See id.* Nor will a refusal to

25

exercise jurisdiction cause Hudson any prejudice through the statute of limitations, since New York C.P.L.R. § 205(a) permits a plaintiff "to recommence a dismissed suit within six months without regard to the statute of limitations." *Id.*  Accordingly, Hudson's state labor law claim is dismissed without prejudice.

## V.      Class Certification is Denied as Moot

All underlying claims in this suit have been dismissed.  Plaintiffs' motion to certify a class of state labor law claims under Rule 23 is therefore denied as moot.

## VI.     Conclusion

For the reasons set forth above, Plaintiffs' motion for partial summary judgment and motion for class certification are denied.  Defendants' motion for summary judgment is granted. This resolves Dkt. Nos. 147, 153, and 154.  The clerk of court is instructed to close the case.

SO ORDERED.

Dated: March **29**, 2016
     New York, New York

ALISON J. NATHAN
United States District Judge